UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELODIE PASSELAIGUE, on behalf of
herself and all others similarly situated,

|                     Plaintiff,        Case No. 16 Civ. 01362 (VSB) (BCM)

       v.

GETTY IMAGES (US), INC., GETTY
IMAGES, INC., BILL DIODATO
PHOTOGRAPHY, LLC, and BILL
DIODATO,

|                     Defendants.

### DECLARATION OF NANCY E. WOLFF

NANCY E. WOLFF declares as follows:

1.      I am a partner with the law firm of Cowan, DeBaets, Abrahams & Sheppard LLP ("CDAS"), counsel for defendants Getty Images (US), Inc., Bill Diodato Photography, LLC, and Bill Diodato (collectively, the "Defendants").  I submit this declaration in support of Defendants' Motion for Sanctions Pursuant to Fed. R. Civ. P. 11 against plaintiff Elodie Passelaigue ("Passelaigue") and her attorneys, including her current attorneys of The Law Office of Jack Fitzgerald, PC, namely, Jack Fitzgerald, Esq., Melanie Persinger, Esq., and Trevor M. Flynn, Esq. of, and their former colleague, Thomas A. Canova, Esq.

2.      On March 16, 2016, I spoke by phone with Passelaigue's attorneys, in particular, Mr. Fitzgerald and Mr. Canova, regarding the claims alleged in their client's Complaint dated February 22, 2016 (Dkt. No. 1).  My colleague, Scott J. Sholder, Esq. of CDAS, was in the room with me and participated in the call.  I advised Passelaigue's attorneys that I had taken the alleged claims seriously and done my due diligence, which entailed, among other things, interviewing Mr.

Diodato and three other witnesses to the signing of the Model Release[1] at issue (one of whom actually signed the Model Release as a witness).

3.      During the call with Passelaigue's attorneys, I went through the Complaint in detail and pointed out the areas that were factually inaccurate.  For example, I advised Passelaigue's attorneys that, contrary to the allegations in the Complaint, Mr. Diodato did not sign any model release or go into a room with Passelaigue at the 2004 Clinique Shoot; that the executed Model Release is a pre-printed Corbis form release with a 2007 date; and that I spoke with three witnesses who very specifically recalled Passelaigue signing the Model Release and knew that it covered images taken at both the 2004 Clinique Shoot and the 2009 Spiegel Shoot.  I provided the names of the three witnesses to Passelaigue's attorneys and informed them that they were all willing to sign sworn statements.  Passelaigue's attorneys stated that they would discuss with their client the discrepancies that I raised on the call.

4.      On April 1, 2016, CDAS sent a letter to Passelaigue's attorneys by email, reiterating the factual discrepancies that I raised on the call and requesting withdrawal of the Complaint in accordance with Rule 11 of the Federal Rules of Civil Procedure.  A true and correct copy of such letter is attached hereto as **Exhibit A**.

5.      On the same date, April 1, 2016, CDAS provided Passelaigue's attorneys with unredacted copies of the Model Release and the signed written statements of all three witnesses, namely, Max Miller, Linda Hilfiker, and Lauren Benward.  True and correct copies of their statements are attached hereto as **Exhibits B-D** respectively.

---

[1] Unless otherwise noted, all defined terms referenced herein, including the term "Model Release," shall have the same meanings assigned in Defendants' Memorandum of Law in support of their Motion for Sanctions Pursuant to Fed. R. Civ. P. 11.

6.      Attached hereto as **Exhibit E** is a true and correct copy of email correspondence by and between Passelaigue and Daureen Castonguay of Wilhelmina International, Inc. dated August 8, 2014.

7.      Attached hereto as **Exhibit F** are true and correct copies of excerpts from the transcript of the Deposition of Elodie Passelaigue dated August 13, 2018.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: New York, New York
      September 6, 2018

                                 NANCY E. WOLFF

# EXHIBIT A



**CDAS**

COWAN,
DEBAETS,
ABRAHAMS &
SHEPPARD LLP

41 MADISON AVENUE
NEW YORK, NY 10010
T: 212 974 7474
F: 212 974 8474
www.cdas.com

SCOTT J. SHOLDER
212 974 7474
ssholder@cdas.com

AILEEN ATKINS
FREDERICK P. BIMBLER
SUSAN H. BODINE
ANDREA F. CANNISTRACI
XAVIER J. CORREA
TIMOTHY J. DEBAETS
ROBERT J. EPSTEIN
DOUGLAS P. JACOBS*
ELEANOR M. LACKMAN†
ELLIS B. LEVINE
STEVEN MASUR
JANIS C. NELSON ▪
JOSHUA B. SESSLER
J. STEPHEN SHEPPARD ◆
SCOTT J. SHOLDER*
MARC H. SIMON
KENNETH N. SWEZEY†
NANCY E. WOLFF ●*†

DAVID E. ASHLEY*
ADAM BEASLEY
ARIEL J. GREENBERG*
BENJAMIN JAFFE
BRITTANY L. KAPLAN
MICHAEL K. LEVIN
MARISSA B. LEWIS*
JONATHAN H. PERITZ*
SIMON N. PULMAN*○

OF COUNSEL:
ROBERT I. FREEDMAN
JERROLD B. GOLD
MICHAEL J. ZUSSMAN

SPECIAL COUNSEL:
ALEX GIGANTE

PHILIP M. COWAN
(1943-2001)
HOWARD ABRAHAMS
(1945-1996)

▪ ADMITTED IN CA
† ALSO ADMITTED IN CA
◆ ALSO ADMITTED IN DC
○ ALSO ADMITTED IN GA
● ALSO ADMITTED IN NJ
* ALSO ADMITTED IN PA

BEVERLY HILLS OFFICE:
9595 WILSHIRE BLVD, SUITE 900
BEVERLY HILLS, CA 90212
T: 310 492 4392 / F: 310 492 4394

April 1, 2016

**VIA FEDEX AND E-MAIL**

Thomas A. Canova
Jack Fitzgerald
THE LAW OFFICE OF JACK FITZGERALD, PC
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, California 92103
tom@jackfitzgeraldlaw.com
jack@jackfitzgeraldlaw.com

Re:   *Passelaigue v. Getty Images (US), Inc., et al.*, No. 16-cv-01362-VSB

Dear Mr. Canova and Mr. Fitzgerald:

We represent Getty Images (US), Inc., Getty Images, Inc., Bill Diodato Photography, LLC, and Bill Diodato (collectively "Defendants") in the above-captioned matter.  As you are aware, under Federal Rule of Civil Procedure 11(b), any paper submitted to the Court by an attorney certifies that he has made an "inquiry reasonable under the circumstances" that "the claims, defenses, and other legal contentions are warranted by existing law" and that "the factual contentions have evidentiary support or . . . will likely have evidentiary support" after reasonable investigation.

After reviewing Elodie Passelaigue's ("Plaintiff") Class Action Complaint dated February 22, 2016 ("Complaint"), conferring with our clients, interviewing witnesses and obtaining sworn statements from those witnesses, and reviewing relevant documentation (including the original model release in this case) and applicable case law, it is clear to us that, in violation of Federal Rule of Civil Procedure 11(b)(3), there is no factual support for most of the statements set forth in your pleading, and no legal support for most of your claims.  These are not instances where reasonable minds could differ; your statements have no evidentiary support because the facts are demonstrably false, and your claims have no legal basis because the law clearly forecloses your arguments.  Please take notice that we will serve a motion for sanctions pursuant to Rule 11 if you do not withdraw the following false statements and frivolous legal claims from your Complaint[1]:

## I.   Demonstrably False Factual Claims

**A.   Signing of the Model Release (Cplt. ¶¶ 23, 27-29, 35, 37, 38, 62-65, 67, 69, 71, 87, 89, 147, 155):**  As we explained to you during our phone call on March 16, 2016, and as evidenced by the sworn declarations of three witnesses and the scans of the original model release we have sent you in conjunction with this letter, the allegations

---

[1] Our reference to specific paragraphs of the Complaint is not meant to be exclusive of other paragraphs that may be similarly meritless or false.  To the extent other paragraphs fall within the scope of our Rule 11 allegations but are not specifically mentioned here, we demand that you also withdraw those paragraphs, and we hereby reserve our right to so demand at any time hereafter.



COWAN,

DEBAETS,

ABRAHAMS &

SHEPPARD LLP

contained in the above-referenced paragraphs are patently false. Mr. Diodato quite simply never showed Plaintiff a model release in 2004 after the Clinique underwater test shoot. Two witnesses have sworn under penalty of perjury that they saw, firsthand, that the model release at issue here was signed by your client in 2009 after the Spiegel shoot, and was drafted specifically to also include the photographs taken during the Clinique underwater test shoot.[2] The model release itself – as attested to in the sworn declaration of Max Miller – is a Corbis form release with a pre-printed date at the bottom showing that the form was revised in 2007.[3] Accordingly, it is impossible for Plaintiff to have signed the release in 2004, as the form did not exist at that time. Your contention that the model release is "doctored" is preposterous and baseless; you admit in the Complaint that the model release is dated June 17, 2007 and you cannot plausibly argue that Mr. Diodato somehow added that date post-hoc in a conscious attempt to mislead your client which, of course, he did not. Your desperate attempt to besmirch Mr. Diodato's name by accusing him in publicly filed court papers of tampering with legal documents without a scintilla of evidence is completely improper and borders on defamatory.

**B. Mr. Diodato's Rights in the Photographs (Cplt. ¶¶ 25, 33, 72, 74):** As you can plainly see in the terms of the invoice between Mr. Diodato and Spiegel, which we provided to you, Bill Diodato Photography, LLC did, in fact, retain all ownership rights in the photographs of Plaintiff. His photographs were not made "for hire" or otherwise assigned to the companies commissioning the shoot. Accordingly, all of your accusations concerning Mr. Diodato's and his company's lack of ownership in the photographs at issue – and therefore their purported inability to license those photographs to Getty Images – are false.

**C. Photographer Pseudonyms (Cplt. ¶¶ 57, 59, 72, 89, 90):** As we also explained to you over the phone, it is common practice in the photography industry for photographers to use pseudonyms when submitting photographs for stock use, and there is nothing false about Getty Images' use of Mr. Diodato's pseudonym on its website in connection with the offering for license of photographs submitted by Mr. Diodato under that pseudonym. (*See, e.g.,* http://www.alamy.com/contributor/how-to-sell-images/captions-and-keywords-for-images/; http://www.shutterstock.com/contributorsupport/articles/kbat02/000006637?q=pseudonym&l=en_US&fs=Search&pn=1). In fact, the United States Copyright Office has even released official guidelines on the use of pseudonyms in copyright registrations. (*See* http://www.copyright.gov/fls/fl101.pdf.) Simple internet research on this topic would have readily shown that your allegations are baseless.

## II. Frivolous Legal Claims

**A. Fraud (Cplt. ¶¶ 32-33, 59, 69, 71, 72, 145-152):** As you intimated during our phone call, your client's supposed lack of awareness of the "unconscionable" terms contained in the model release resulted from her failure to read the model release, and the allegations in the Complaint all but concede this point. For instance, that Mr. Diodato supposedly did not "disclos[e] the actual unconscionable terms" of the one-page release inherently means that your client was otherwise unaware of the terms; she would have been aware of them had she read the simple release. (Cplt. ¶ 145.) Also, that Mr. Diodato allegedly "direct[ed] [Plaintiff's] attention only to the signature line and other non-substantive portions" of the release carries the same implication. (*Id.* ¶ 147.)

---

[2] *See* Declaration of Linda Hilfiker at ¶¶ 5 & 6; Declaration of Max Miller at ¶¶ 6 & 7.
[3] *See* Declaration of Max Miller at ¶ 9.



COWAN,

DEBAETS,

ABRAHAMS &

SHEPPARD LLP

Your client could have easily directed her own attention to the substantive terms of the release which, we cannot stress enough, was one page long and in plain English. (Your client does not claim to be unable to read or understand the English language). Similarly, your client would have known Mr. Diodato's purported statements were false (and we do not concede that they were) had she simply read the release. (*Id.* ¶ 149).[4] New York law is clear that allegations that the signatory to a contract "did not read the provision, or that it was not brought specifically to her attention are of no avail, since, as a signatory to the contract, she is presumed to know the contents of the instrument she signed and to have assented to such terms." *British W. Indies Guar. Trust Co. v. Banque Internationale a Luxembourg*, 567 N.Y.S.2d 731, 732 (App. Div. 1st Dept. 1991). *See also Jackson v. Broad. Music, Inc.*, No. 04 CV 5948 (TPG), 2006 WL 250524, at *9 (S.D.N.Y. Feb. 1, 2006) (dismissing fraudulent inducement claim because the one-page agreement at issue was clear that Plaintiff was releasing his rights to his music, so "Plaintiff could not reasonably have relied on any alleged misrepresentation to the contrary").

Accordingly, as a matter of law, your client was not "conned" or "induced" by Mr. Diodato or anyone else into signing the model release. The case law is clear that a "plaintiff may not avoid [her] obligations under a clearly worded release on the grounds that the defendant falsely misrepresented the true significance of the document to [her] in order to secure [her] signature." *Weil v. Johnson*, No. 119431/02, 2002 WL 31972157, at *2 (N.Y. Sup. Ct. Sept. 27, 2002). Put another way, a fraud claim fails on reasonable reliance grounds when the plaintiff purports to have relied on an oral promise that is "flatly contradicted by [the] express terms" of a written agreement. *See, e.g., Village on Canon v. Bankers Trust Co.*, 920 F. Supp. 520, 530-31 (S.D.N.Y. 1996); *Urstadt Biddle Props., Inc. v. Excelsior Realty Corp.*, 885 N.Y.S.2d 510, 512 (App. Div. 2d Dept. 2009) (a "conflict between an express provision in a written contract and a prior alleged oral representation . . . negates a claim of reasonable reliance upon the oral representation" for purposes of fraud). Plaintiff's fraud claim falls squarely within this body of case law such that it should have been immediately obvious that the claim was not warranted by existing law.

**B. Right of Publicity (New York & Washington) (Cplt. ¶¶ 51, 114, 115, 155):** The presence of a signed model release evidences Plaintiff's consent to the uses set forth in that agreement, and you are unable to avoid your client's agreement to the terms of the model release for the reasons stated above. Accordingly, because Defendants' use of Plaintiff's likeness was not without her permission, your right of publicity claims fail as a matter of law under both New York and Washington law.[5]

**C. New York Gen. Bus. L. § 349 (Cplt. ¶¶ 121-127):** This claim fails as a matter of law, and basic legal research into the requirements to state a claim under the statute would have revealed the futility of pleading it in the first place. To state a claim under N.Y. GBL § 349, the "gravamen of the complaint must be consumer injury or harm to the public interest." *Conopco Inc. v. Wells Enters., Inc.*, No. 14 CIV. 2223 NRB, 2015 WL 2330115, at *6 (S.D.N.Y. May 14, 2015). Confusion regarding issues like ownership of intellectual property is insufficient to state a claim under § 349. *Id.* For instance, trademark infringement actions alleging only general consumer confusion do not threaten the requisite direct harm to consumers for purposes of stating a claim

---

[4] Your reference during our phone conversation to the commonly known phenomenon of "click-wrap" licenses (such as iTunes terms and conditions) that "nobody" reads only serves to bolster our position.

[5] Defendants do not concede that Washington law even applies here.



COWAN,

DeBAETS,

ABRAHAMS &

SHEPPARD LLP

under § 349 unless there is specific and substantial injury to the public interest over and above the damages caused by ordinary trademark infringement. *See Sola Franchise Corp. v. Solo Salon Studios Inc.*, No. 14-CV-0946, 2015 WL 1299259, at *14 (E.D.N.Y. Mar. 23, 2015). *See also Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519 (S.D.N.Y. 2012).

Your allegations that Defendants "misrepresent[ed] to consumers and the public at large" that they could license Plaintiff's image and falsely stated that "plaintiffs and class members use or otherwise endorse or sponsor or are otherwise affiliated with Getty's purported licensees and/or their products and services" are precisely the types of claims *not* covered by § 349 – that is, they do not present injuries distinct from the harm that intellectual property and false advertising laws generally seek to redress. *Nomination di Antonio e Paolo Gensini S.N.C. v. H.E.R. Accessories Ltd.*, No. 07 Civ. 6959, 2009 WL 4857605, at *8 (S.D.N.Y. Dec. 14, 2009). Moreover, cases involving allegations of false advertising fall under § 349 only when there is a risk to public health or safety, such as where the FTC would intervene, which is clearly not the case here. *See Sports Traveler, Inc. v. Advance Magazine Publishers, Inc.*, 96 Civ. 5150, 1997 WL 137443 (S.D.N.Y. Mar. 24, 1997).

**D. Class Action (Cplt. ¶¶ 47, 92, 99-112, 146, 147, 149):** It is abundantly clear that there can be no class here. It is evident from the face of your Complaint that the nature of the claims at issue are highly fact-specific and, pursuant to applicable case law, completely antithetical to class treatment.

1. Rule 23(a): Commonality and Typicality:[6] The following excerpts from your Complaint show that individual issues in this case will predominate common issues, and that your client's situation will not be deemed typical of other putative class members':

   i. "[D]epending on the circumstances, such use might violate contracts she had with her actual clients, or otherwise compromise and damage those relationships and her career." (Cplt. ¶ 47): Obviously Plaintiff's entitlement to damages (if any) will be specifically keyed to her career, her contracts, her clients, her relationships, and her reputation. These factors are unique and will not be the same for any other putative class member, and will inherently mean that Plaintiff's claims are not typical of the rest of the class. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) (In order to satisfy commonality, a plaintiff's claims "must depend on a common contention . . . of such a nature that is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke."). *See, e.g., Salon Fad v. L'Oreal USA, Inc.*, No. 10 CIV 5063 DLC, 2011 WL 4089902, at *11 (S.D.N.Y. Sept. 14, 2011) (denying class certification because plaintiffs "failed to demosntrate that the alleged injury to the salons' reputations is susceptible of class-wide proof").

   ii. "Professional fees," "usage fees," "licensing fees," "a discount on the professional fees class members would otherwise demand," "the market value for their services," class members' "reputations" and "prospective business relationships and

---

[6] Defendants do not concede that you will satisfy the numerosity and adequacy requirements of Rule 23(a). Rather, Defendants believe you also will fail those prerequisites to class certification but need not address them here.



opportunities" (Cplt. ¶¶ 100-103):  These items are all fact-dependent and will vary by individual plaintiff, and are not suitable to the class form.

iii.  "Diodato made material false representations to plaintiff and class members, all the the same overall message, variously including" statements regarding how he would use the photographs, and "Diodato also made material false representations" by failing to disclose various portions of the releases" (Cplt. ¶¶146-147):  A fraud claim founded upon oral misrepresentations is not an appropriate matter for class certification where, as here, the representations are not uniform in all material respects. *See Moore v. PaineWebber*, 306 F.3d 1247, 1252 (2d Cir. 2002) (affirming denial of class certification; where "fraud actions [are] based on individualized misrepresentations," class certification is improper because plaintiffs will need to submit proof of the statements made to each plaintiff, the nature of the varying material misrepresentations, and the reliance of each plaintiff upon those msrepresentations in order to sustain their claims"). *See also* Fed. R. Civ. P. 23(b)(3) advisory committee's note (1966 amendment) ("[A]though having some common core, a fraud case may be unsuited for treatment as a class action if there was a material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.").  There is no plausible way that Mr. Diodato's conversations with other models, if any, were identical to his purported conversation with Plaintiff, or that his representations concerning various uses of various types of photographs, and the models' understandings of those representations, were identical.

2.  <u>Rule 23(b)(3): Common questions of law and fact will not predominate</u>:  In addition to the above, the following are primary examples of the individualized nature of the claims at issue here that will doom any putative class you may seek to certify:

i.  Mr. Diodato's manner of conveyance of rights to his photographs and whether Mr. Diodato had rights in particular photographs will vary based on the photograph and the job.  (Cplt. ¶ 107(a), (b).)

ii.  Getty Images' awareness of Mr. Diodato's rights will vary based on the photograph submitted.  (Cplt. ¶ 107(c), (d).)

iii.  As dicussed herein, whether a particular plaintiff will satisfy the elements of each of your client's causes of action will inherently vary by plaintiff and a plaintiff's specific circumstances in dealing with the Defendants.  The exact circumstances of any of the Defendants' purported conduct will not be the same in each putative class member's case.  For instance, the circumstances surrounding the signing of each model release will be unique, including the words spoken and understood between the parties; the model release at issue in each scenario may be different, whether in form (depending on what pre-printed form was used and in what year), substance (model release terms sometimes are amended), timing of signature (whether at or after the shoot), presence of witnesses (and how many), and awareness by a model of the terms of the release; and the experience, sophistication, and "cache" of each model will vary.  (Cplt. ¶ 107(e)-(i).)

iv.  The propriety of injunctive relief, compensatory damages, restitution, punitive damages, and fees and expenses will also depend on the plaintiff and the situation.  As we explain herein, each model's fees charged and royalties earned will



specifically depend on that particular model's career path, success, niche specialty areas, appearance, personality, and standing in the modeling industry as well as innumerable other factors that cannot apply across class members. (Cplt. ¶ 107(j)-(n).) The reputations garnered by certain models and the degree of purported damage thereto are particularly ill-suited to the class action mechanism, and there is plenty of case law to this effect. *See, e.g.*, *Salon Fad*, 2011 WL 4089902, at *11.

3. <u>Rule 23(b)(2): No Injunctive Class</u>: As an initial matter, your client does not have standing to represent an injunctive class because she does not allege future imminent harm. *See Schroedel v. N.Y. Univ. Med. Ctr.*, 885 F. Supp. 594, 598 (S.D.N.Y. 1995) (to establish standing for injunctive relief, a plaintiff must show "a real or immediate threat that the plaintiff will be wronged again"). Nonetheless, certification under Rule 23(b)(2) is inappropriate because the allegations in the Complaint regarding the class members' purported injuries relate predominately to money damages. (*See generally*, Cplt. ¶¶ 99-103.) *See Benfield v. Mocatta Metals Corp.*, No. 91 CIV. 8255 (LJF), 1993 WL 148978, at *5 (S.D.N.Y. May 5, 1993) (certification under Rule 23(b)(2) is not appropriate where plaintiff's request for injunctive or declaratory relief is ancillary to a claim for monetary damages). Moreover, as discussed above, individualized factfinding would be required to determine the putative class members' injuries, making it impossible to fashion a single injunction that would provide relief to each class member. *See Robinson v. Metro-North Commuter R.R.*, 267 F3d 147, 162 (2d Cir. 2001) (The Rule 23(b)(2) type of class action is "intended for cases where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury."); *Ault v. J.M. Smucker Co.*, No. 13–CV–3409, 310 F.R.D. 59, 68, 2015 WL 4692454, at *8 (S.D.N.Y. Aug. 6, 2015) (A "Rule 23(b)(2) class is appropriate only when a single injunction or declaratory judgment would provide relief to each member of the class."). Based on clear precedent, you cannot plausibly establish a Rule 23(b)(2) class, and your strained attempt to do so warrants Rule 11 sanctions.

**E. Inclusion of Getty Images, Inc. as a Defendant: (Cplt. ¶¶ 6, 76):** As we explained to you on the phone, Getty Images, Inc. is not a proper defendant in this case, and has been released from other cases where it was improperly named. *See, e.g.*, *Princeton Digital Image Corp. v. Facebook, Inc.*, No. 2:11-CV-400-JRG, 2012 WL 3647182 (E.D. Tex. Aug. 23, 2012) (granting Getty Images, Inc.'s motion to dismiss for lack of personal jurisdiction where "it was wrongly named in the complaint because [plaintiff] confused it with its operating subsidiary, Getty Images (U.S.), Inc."); *Car-Fresnher Corp. v. Getty Images, Inc.*, 822 F. Supp. 2d 167, 172 (N.D.N.Y. 2011) (Getty Images (U.S.), Inc. substituted for Getty Images, Inc. because Getty Images, Inc. had no involvement in the matters at issue).

*** 

The above statements of purported fact and legal claims in your Complaint violate Rule 11 because they are "utterly lacking in [evidentiary] support," *Kingvision Pay-Per-View Ltd. v. Ramierez*, 2005 WL 1785113, at *3 (S.D.N.Y. July 28, 2005), and "after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded" in fact or in law. *Id.* at *2. *See also Margo v. Weiss*, 213 F.3d 55 (2d Cir. 2000) (standard for whether a claim is frivolous or unwarranted is "objective unreasonableness"). It is evident that these objectively unreasonable statements and claims were made in the absence of due diligence, or worse, are being asserted as a bad faith tactic to harass or disparage

COWAN,

DEBAETS,

ABRAHAMS &

SHEPPARD LLP

Defendants. This conduct constitutes the type of abusive behavior Rule 11 was designed to prevent. *See* Fed. R. Civ. P. 11(b).

As a professional courtesy, we are providing you with an opportunity to resolve these issues informally and without the need to involve the Court in the Rule 11 process. Please confirm that you will withdraw the above-mentioned false factual allegations and legal claims within the next **7 calendar days**. If you insist on adhering to these demonstrably false claims, we will have no choice but to formally serve a Rule 11 motion and start the clock to seek sanctions, which are available against both you and your client. *See* Fed. R. Civ. P. 11(c)(1). *See, e.g., T.B.I. Indus. Corp. v. Emery Worldwide*, 900 F. Supp. 687, 696 (S.D.N.Y. 1995) (granting Rule 11 sanctions where defendant refused to voluntarily dismiss despite receiving documentation showing its third-party claim lacked merit).

We look forward to your prompt cooperation. Please do not hesitate to contact us if you would like to discuss this matter further. The Defendants reserve all of their rights, remedies, claims, and defenses, whether legal or equitable.

Sincerely,

*Scott J. Sholder* /MBL

Scott J. Sholder

cc:     Nancy E. Wolff, Esq.
        Marissa B. Lewis, Esq.

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELODIE PASSELAIGUE, on behalf of herself and all others similarly situated,<br><br>        Plaintiff,<br><br> v.<br><br>GETTY IMAGES (US), INC., GETTY IMAGES, INC., BILL DIODATO PHOTOGRAPHY, LLC,<br>and BILL DIODATO,<br><br>        Defendants. | Civil Action No. 16-cv-01362 (VSB) (BCM)<br><br>**DECLARATION OF<br>MAX MILLER** |

MAX MILLER, being duly sworn, deposes and says:

1.       I submit this declaration in connection with the above-captioned action.  I have personal knowledge of the following facts and, if called as a witness, I could competently testify thereto.

2.       I am a digital photography technician and have worked with Bill Diodato at photo shoots many times over the last seven years.  As a digital technician, my responsibilities include lighting, running the computer, and ingestion of the model releases.

3.       I was present at the Spiegel catalog shoot on June 11, 2009.  I specifically remember this shoot – including the model, Elodie Passelaigue, and the signing of the model release (the "Model Release"), because it was one of the first times that I worked with Mr. Diodato.

4.       I typically handled the model releases at photo shoots.  I recall, however, that Mr. Diodato handled the Model Release in this instance because he had a prior working relationship with Ms. Passelaigue and also wanted to ask her about another photo shoot they had done

together in 2004 for Clinique.  It seemed that this Model Release was more detailed or complicated than others, so Mr. Diodato wanted to make sure that it was done properly.

5.      If asked the purpose of the model release, Mr. Diodato or I would tell a model that the release allowed Mr. Diodato to use the photographs for whatever he would like.

6.      I was present when the Model Release was signed.  I recall sitting at a table in the studio with several other people, but I did not sign my name as a witness.  I saw Mr. Diodato fill out his part of the Model Release (name of photographer, date and description of shoot) before handing it to Ms. Passelaigue, who then signed her name, and then the witnesses, who also signed.  I recall Mr. Diodato asking Ms. Passelaigue about the Clinique shoot around that time.

7.      I further remember Ms. Passelaigue taking her time reading the Model Release because I was clearing food from the lunch table and she was still reviewing it.  Mr. Diodato nor I would ever hover over a model while they were reviewing a release.

8.      Generally, after Mr. Diodato has a release signed, I am responsible for scanning the release onto the computer.  I usually then apply a copy of a photograph taken at each photo shoot covered by the release to the release digitally.  In this instance, the Model Release covered two photo shoots, so I applied two photographs – one from each shoot – to the Model Release.

9.      I can confirm that the Model Release was a standard Corbis release that was pre-printed, prior to signing, with "Rev'd 6-18-07" stamped on the bottom left-hand corner.

I declare that, to the best of my knowledge and belief, the information contained herein is true and correct.

Dated: New York, New York
       April 1, 2016

MAX MILLER

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELODIE PASSELAIGUE, on behalf of herself
and all others similarly situated,

        Plaintiff,

v.

GETTY IMAGES (US), INC., GETTY
IMAGES, INC., BILL DIODATO
PHOTOGRAPHY, LLC,
and BILL DIODATO,

        Defendants.

Civil Action No. 16-cv-01362
(VSB)(BCM)

**DECLARATION OF
LINDA HILFIKER**

LINDA HILFIKER, being duly sworn, deposes and says:

1.    I submit this declaration in connection with the above-captioned action.  I have personal knowledge of the following facts and, if called as a witness, I could and would competently testify thereto.

2.    I worked with Bill Diodato in the photo industry for many years and am familiar with his practices regarding model releases.

3.    I produced the Spiegel catalog shoot on June 11, 2009, and was present in the studio that day.

4.    At the time of the Spiegel catalog shoot, I was aware that Mr. Diodato had done a test shoot with the same model, Elodie Passelaigue, for Clinique in 2004.  I recall that, when Mr. Diodato learned that the model was coming in for the Spiegel catalog shoot, he decided that he would ask her to sign a release for both the Spiegel catalog shoot and the earlier Clinique shoot.

5.    I was a witness to the June 11, 2009 model release at issue in the above-captioned matter (the "Model Release").  Mr. Diodato had asked Ms. Passelaigue to sign the Model

Release at a lunch table in the rented studio.  Several other people, including me, sat around the

table as the Model Release was signed.

6.      Mr. Diodato filled out the "Description of Shoot," which is his general practice,

filled in the date and signed his name.  He then handed the Model Release to Ms. Passelaigue,

who, after reading the Model Release, filled out her part and signed her name before the

witnesses signed their own names.

I declare that, to the best of my knowledge and belief, the information contained herein is

true and correct.

Dated: New York, New York
       March 29, 2016

LINDA HILFIKER

STATE OF New York )
                              ss.:
COUNTY OF New York)

On the 29 day of March                , 2016, before me personally appeared Linda
Hilfiker, personally known to me or proved to me to be the individual whose name is subscribed
to the within instrument and acknowledged to me that she executed the same in her capacity, and
that by her signature on the instrument, the individual executed the instrument.

Notary Public

VALMIRA CEKOVIC
Notary Public - State of New York
NO. 01CE6310214
Qualified in Richmond County
My Commission Expires Aug 25, 2018

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELODIE PASSELAIGUE, on behalf of herself
and all others similarly situated,

                Plaintiff,

   v.

GETTY IMAGES (US), INC., GETTY
IMAGES, INC., BILL DIODATO
PHOTOGRAPHY, LLC,
and BILL DIODATO,

                Defendants.

Civil Action No. 16-cv-01362
(VSB)(BCM)

**DECLARATION OF
LAUREN BENWARD**

LAUREN BENWARD, being duly sworn, deposes and says:

1.     I submit this declaration in connection with the above-captioned action. I have personal knowledge of the following facts and, if called as a witness, I could competently testify thereto.

2.     I have worked with Bill Diodato on photo shoots in the past as an independent contractor fashion stylist. Mr. Diodato generally oversees the photo shoots to ensure that everything is done properly.

3.     I was the fashion stylist for the Spiegel catalog shoot on June 11, 2009. I was present in the studio for the shoot that day. I remember the shoot and the model, Elodie Passelaigue.

4.     I recently reviewed a copy of the model release (the "Model Release") and recognized my signature and handwriting on the bottom left corner of the page. I know that I would not have signed the Model Release unless I actually witnessed the model sign it.

I declare that, to the best of my knowledge and belief, the information contained herein is true and correct.

Dated: New York, New York
      March 31, 2016

LAUREN BENWARD KROUSE

STATE OF California )
                        ss.:
COUNTY OF Sonoma )

On the 31st day of March, 2016, before me personally appeared Lauren Benward, personally known to me or proved to me to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual executed the instrument.

Joy Wesley
Notary Public

Please see attached California Acknowledgment.

| CALIFORNIA ALL-PURPOSE |
| ACKNOWLEDGMENT |

A notary public or other officer completing this certificate verifies only the  identity of the individual who signed the document to  which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _Sonoma_

On _Thursday, March 31st 2016_ before me, _Joy Wesley_, Notary Public, personally appeared _Lauren Bernard Krause_, who proved to me on the basis of satisfactory evidence  to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

JOY WESLEY
Comm. #2104268
Notary Public · California
Sonoma County
Comm. Expires Mar 22, 2019

_Joy Wesley_
Joy Wesley
Notary Public, Sonoma County
Commission #2104268
Expires 03-22-2019

(SEAL)

☐   If marked, then attached pages will bear embossment of above notary.

**Optional:**  Not required by law, however, may prove valuable to persons relying on the document and could prevent fraudulent reattachment of this form.

**Signature Authority of Signer:**
☐ Individual(s)
☐ Corporate Officer(s)

_____ (Title)
☐ Partner (Limited or General)
☐ Attorney In Fact
☐ Trustee(s)
☐ Guardian/Conservator
☐ Other_____

**Description of Attached Documents:**
Title or type of Document: _____
_____
Number of Pages: _____
Date of Document: _____
Signer(s) other than Named Above:
_____
_____

© Copyright 2015 California Notary Academy, PO Box 729, Oakley, California 94561 - www.californianotaryacademy.com

# EXHIBIT E



Hello Daureen,

My name is Kevin and I am in the service department at Getty Images. I have
attached a redacted copy of the requested model release. We do this for all
releases as we do not want any personal information of the photographer or client
to be available. If you have any questions please let myself or Sarah know and we
will be happy to help! Thank you for your time.

**Kevin Marren**
Kevin.Marren@gettyimages.com

&lt;release.jpg&gt;

 Connected to Microsoft Exchange

WIL-0109

# EXHIBIT F

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   ----------------------------------------X
    ELODIE PASSELAIGUE, on behalf of herself
4   and all others similarly situated,

5                                    PLAINTIFF,

6
           -against-          Case No:
7                             16-cv-01362

8   GETTY IMAGES (US), INC., GETTY IMAGES,
    INC., BILL DIODATO PHOTOGRAPHY, LLC, and
9   BILL DIODATO,

10                                  DEFENDANTS.
    ----------------------------------------X
11

12                   DATE:  August 13, 2018

13                   TIME:  10:30 A.M.

14

15

16              CONFIDENTIAL VIDEOTAPED

17   DEPOSITION of the Plaintiff, ELODIE

18   PASSELAIGUE, taken by the Defendants,

19   pursuant to a Court Order and to the

20   Federal Rules of Civil Procedure, held at

21   the offices of Cowan, DeBaets, Abrahams &

22   Sheppard, LLP, 41 Madison Avenue, New York,

23   New York 10010, before Joshua B.

24   Edwards, RDR, CRR, CLR, a Notary Public of

25   the State of New York.

```
 1

 2    A P P E A R A N C E S:

 3


 4     THE LAW OFFICE OF JACK FITZGERALD, P.C.
            Attorneys for the Plaintiff
 5          Hillcrest Professional Building
            3636 Fourth Avenue, Suite 202
 6          San Diego, California 92103
            BY:   TREVOR M. FLYNN, ESQ.
 7


 8


 9     COWAN, DEBAETS, ABRAHAMS & SHEPPARD, LLP
            Attorneys for the Defendants
10          41 Madison Avenue, Suite 38
            New York, New York 10010
11          BY:   SCOTT J. SHOLDER, ESQ.
                       -and-
12               MARISSA LEWIS, ESQ.
            File #:  14040-104
13


14     ALSO PRESENT:

15

16          ANDREW SACHS, ESQ.
            Director, Corporate Counsel
17          Getty Images

18

19          STEPHEN KENT
            Legal Videographer

20
            Ms. Passelaigue's minor daughter
21

22              *       *       *

23

24

25
```

1

2      F E D E R A L   S T I P U L A T I O N S

3

4            IT IS HEREBY STIPULATED AND AGREED by

5      and between the counsel for the respective

6      parties herein that the sealing, filing and

7      certification of the within deposition be

8      waived; that the original of the deposition

9      may be signed and sworn to by the witness

10     before anyone authorized to administer an

11     oath, with the same effect as if signed

12     before a Judge of the Court; that an

13     unsigned copy of the deposition may be used

14     with the same force and effect as if signed

15     by the witness, 30 days after service of

16     the original & 1 copy of same upon counsel

17     for the witness.

18

19            IT IS FURTHER STIPULATED AND AGREED

20     that all objections except as to form, are

21     reserved to the time of trial.

22

23                  *     *     *     *

24

25

```
 1                E. PASSELAIGUE - Confidential
 2      to mark as Defense Exhibit 1 for
 3      identification.
 4                    (Defense Exhibit 1, Complaint,
 5                 marked for identification.)
 6           Q.    Do you recognize this document?
 7      You can flip through it.  Take your time.
 8           A.    (Perusing.)  It is one of the
 9      many documents that were drafted on my
10      behalf.
11           Q.    Did you review it at any point
12      before it was filed?
13           A.    Sure I did.
14           Q.    And is everything in it
15      accurate, to the best of your knowledge?
16           A.    To the best of my knowledge.
17      But I'm just scanning through it right now.
18      So unless I read it all --
19           Q.    But to be clear, you still
20      stand behind all of the allegations in the
21      Complaint?
22           A.    I still stand behind all of the
23      allegations in the Complaint, yes.
24           Q.    I am going to hand you two
25      documents that we will mark for
```

```
 1                E. PASSELAIGUE - Confidential
 2          Q.    Are there other agencies that
 3    are, for lack of a better term, lower-tier?
 4          A.    There are, but there are also
 5    other high-caliber agencies.  There are
 6    both.
 7          Q.    What do you consider the
 8    agencies that you have been represented by?
 9    What kind of top-tier or --
10          A.    Oh, yeah.
11          Q.    Yeah?
12          A.    Oh, yeah.  They are at the top.
13                MR. SHOLDER:  I am marking for
14           identification as Defense Exhibit 11
15           a copy of a Model Release.
16                (Defense Exhibit 11, Model
17           Release, was marked for
18           identification as of this date.)
19          Q.    Do you recognize this document?
20          A.    I do recognize this document,
21    yes.
22          Q.    This is a true and correct
23    copy, to the best of your knowledge?
24          A.    It's the copy that I was
25    provided -- sorry.
```

1                E. PASSELAIGUE - Confidential

2                MR. FLYNN:  Sorry, I am just

3           going to interpose a late objection.

4           It calls for a legal conclusion.  But

5           continue.

6           A.    It's the second copy that I

7     was -- that my agent, I believe, obtained

8     from Getty Images.

9           Q.    The second copy?

10          A.    Yes.  The first one was -- had

11    paragraphs that were blanked.

12          Q.    This copy of the release came

13    from your agency, to the best of your

14    recollection?

15          A.    I forget if it was the first

16    agent that worked on the case or if it was

17    my agency that eventually got it; one of

18    the two.  But it was the second release

19    that we obtained.  The first one did not

20    make mention of Bill Diodato at all.  It

21    was all blanked out on that side.  I had

22    other things blanked out, but I forget.

23                MR. SHOLDER:  Marking for

24           identification as Defense Exhibit 12

25           another copy of the model release.

                    E. PASSELAIGUE - Confidential

1                    E. PASSELAIGUE - Confidential

2                    (Defense Exhibit 12, Model

3              Release, was marked for

4              identification as of this date.)

5         Q.    (Counsel handing.)

6         A.    Thank you.

7         Q.    You're welcome.

8              Do you recognize this copy of

9    the model release?

10        A.    No.  I was under the impression

11   it was the other side that was blanked out.

12   I have to look in my archives.

13        Q.    Why don't I show you the one

14   that I think you are talking about and we

15   will go from there.

16        A.    Oh, yes, that's it.

17              MR. SHOLDER:  We will mark this

18         Defense Exhibit 13.

19              (Defense Exhibit 13, Model

20         Release with redactions, was marked

21         for identification as of this date.)

22        Q.    Do you recognize this copy?

23        A.    Mm-hmm.

24        Q.    Is this the copy of the model

25   release that Getty Images provided to you

1              E. PASSELAIGUE - Confidential

2      initially?

3          A.    Yes, it is, the copy that left

4      us very puzzled as to who had taken -- who

5      had taken those pictures, who had taken the

6      one picture we could not identify.

7          Q.    If you go back to D. 12, the

8      one I just gave you before, do you have any

9      idea where this release came from?

10          A.    It has to have come from either

11      a photographer or Getty.

12          Q.    Did you have a copy of this

13      release at all --

14          A.    No.

15          Q.    -- at any time?

16          A.    No.

17          Q.    Did you check your records?

18          A.    Yeah, I did.

19          Q.    We can look back at D. 11,

20      which is the unredacted version.  That's

21      your signature on the line that says "for

22      model only"?

23          A.    Mm-hmm.  Looks like my

24      signature, yes.

25          Q.    Well, it looks like your

```
 1              E. PASSELAIGUE - Confidential
 2     signature and is, I guess, are two
 3     different things.  So do you believe that
 4     this is, in fact, your signature?
 5          A.    It looks like my signature
 6     signed in a hurry, so yes, I believe it
 7     would be my signature, but it would have
 8     been signed in a very big hurry.  If you
 9     compare to the contract, the Ford Model
10     contract, my last name is legible.
11          Q.    Did you read the release before
12     you signed it?
13          A.    I would think I would have if I
14     signed it.  I usually read anything that I
15     sign.
16          Q.    Do you have a specific
17     recollection of about whether you signed
18     it -- I'm sorry, about whether you read it?
19          A.    Do I have a specific
20     recollection?  No, I don't have a specific
21     recollection of the date and time when this
22     was actually signed.
23          Q.    If you could take a look at
24     Exhibit D. 4, back at the beginning of the
25     file somewhere.  You can put that one aside
```

```
 1                E. PASSELAIGUE - Confidential
 2    for now, now that I think of it.
 3                Let's talk a bit about the
 4    Clinique test shoot.  Can you tell me your
 5    recollection of that day.
 6         A.    Yes.  I remember the photo
 7    studio was Fast Ashleys in Brooklyn.  It
 8    was -- it never happened for us to shoot in
 9    New York.  So it was the only shoot that
10    Clinique ever organized.  It was not meant
11    to produce an outcome that would use --
12    that would be used for commercial purposes.
13                It was more of a -- it was more
14    of a test, because the concept was
15    difficult to take pictures of.  The concept
16    was to have the model immersed in a
17    full-body-sized fish tank.  So you needed
18    to have a photo studio that was big enough
19    to accommodate that fish tank, that
20    quantity of water too, because it's very
21    nice but you have to empty that tank.
22                So you needed to have that, see
23    how the light reflects and distorts.  As
24    you can see in this the picture, the bottom
25    half, the immersed part is much wider than
```

```
1              E. PASSELAIGUE - Confidential
2      the top half.  So all of these details are
3      the kind of details we were looking to --
4      to capture prior to actually having the
5      whole team present and on the clock.
6                     I mean, it was not my decision,
7      clearly.  It was the decision of the art
8      director.  But that's what they were
9      looking to test is how feasible that
10     concept was.  The photographer for Clinique
11     was not present that day on the shoot,
12     which was unheard of.  I don't know why.
13     The makeup artist was not present.  The
14     hair stylist was not present.
15                     Everybody was based in Paris.
16     So it was a reduced team:  The art
17     director, myself, Merrily and clearly Bill
18     Diodato.  I don't remember if there was
19     anybody else that was there.
20          Q.    Who is Merrily?
21          A.    Merrily was in charge of -- I
22     think her title was art buyer, but she was
23     in charge of hiring models.
24          Q.    For Clinique?
25          A.    For Clinique.
```

1               E. PASSELAIGUE - Confidential

2          Q.    Do you remember if there was

3     anybody else present other than who you've

4     already told me?

5          A.    I don't remember anybody else

6     being present.  But I know for sure the

7     regular actors of that story, the makeup

8     artist, hair stylist, photographer were not

9     present.  The model maker was not present,

10    either.

11         Q.    How long did that shoot last?

12         A.    I don't know.  I want to say a

13    whole day, but it could have been a short

14    day.  I'm not sure.

15         Q.    So you told me the name of the

16    studio.  Do you remember what the studio

17    looked like?

18         A.    Well, it's kind of a legendary

19    studio because it used to be a car garage

20    for collectible vehicles.  And it was

21    turned into a studio.  And at the time it

22    still had some of the vehicles in there.

23               So, yeah, and also I didn't

24    know how to get there because I never

25    traditionally shot in Brooklyn for

    1           E. PASSELAIGUE - Confidential
    2    anything.   Again, they had chosen the
    3    studio for specific reasons.   Usually we
    4    shot in Manhattan.
    5           Q.    Do you remember anything else
    6    about the shoot?
    7           A.    What do I remember?  I didn't
    8    have proper hair and makeup.  I didn't even
    9    remember there was a flower, but clearly in
   10    the picture you can see there's a flower.
   11    I remember the size of the tank.
   12               I remember -- I remember the
   13    photographer was an odd person that had
   14    never been on the team before whom I now
   15    know as Bill Diodato.  But that day, it
   16    seemed to me like it was the first time I
   17    have meeting him.  Time will tell that I
   18    had worked with him prior, and I didn't
   19    remember him.  What else?  I don't even
   20    remember if we had lunch or not.  So that's
   21    not helping us determine if it was a long
   22    day or not.
   23           Q.    That's okay.  Whatever you can
   24    remember.
   25           A.    I remember I was wearing a

```
 1              E. PASSELAIGUE - Confidential
 2      bathing suit.
 3              Q.     I should hope so, in a tank of
 4      water.
 5              A.     I believe that's it.
 6              Q.     What do you recall about the
 7      June 2000 -- the June 11, 2009, Spiegel
 8      shoot?
 9              A.     Spiegel?  I forget the name of
10      the studio, but I can visualize it.  It's
11      one of those -- it's that one photo studio,
12      it might have been Sun Studios.  It's
13      located -- when you are in Midtown around
14      34th Street, you have, you have some kind
15      of, like, highway/tunnel exit or entrance
16      that passes by.  It was the top floor, I
17      think.  It was waist-down, meaning
18      unrecognizable, meaning my face was not
19      exposed and makeup was not supposed to be
20      applied.
21              It was, I know now, I don't
22      know if I would have recalled that just
23      from seeing the -- from seeing the picture,
24      I couldn't tell where it had been taken
25      from.  But I know now the Spiegel shoot was
```

1               E. PASSELAIGUE - Confidential

2      only a half day.  Um, clearly it was Bill

3      shooting it, Diodato.

4               What else do I remember?  There

5      was a stylist on this job because clearly

6      when you're doing waist-down, you need to

7      have the pants fit correctly.  The emphasis

8      is on that.

9           Q.    Do you remember who the stylist

10     was?

11          A.    No idea.

12          Q.    Was anybody else present aside

13     from the photographer and the stylist?

14          A.    It was a big team.  I would

15     believe that the client would have been

16     present.  I think it was a pretty big team.

17     I don't remember it being a small team, but

18     I don't remember all the details of that

19     shoot anyway.

20               And I don't remember the names

21     of any -- I mean, I have had to think about

22     that shoot because of this case.  I don't

23     remember the names of the people that were

24     present.  They are not people that I worked

25     with regularly.

1                    E. PASSELAIGUE - Confidential

2          Q.     Do you recall if there was

3     anybody there, any photo assistant or any

4     lighting technician?

5          A.     There probably would have been

6     because on that type of shoot, the

7     photographer is not alone.

8          Q.     When, approximately, would it

9     have started in the morning?

10          A.     If it's a half day, we would

11     have started anywhere from eight o'clock to

12     nine o'clock in the morning.

13          Q.     And when you say "half day,"

14     what does that mean exactly?

15          A.     It means they don't need me for

16     the whole day.  They only need me until

17     they break for lunch.

18          Q.     Which would be about what time?

19          A.     12:00 or 1:00, noon or 1:00.

20     Typically on these shoots when they are

21     half day, one model is in the morning.

22     Another model or two other models are at a

23     different time.

24          Q.     Do you recall the circumstances

25     of signing this release?

1              E. PASSELAIGUE - Confidential

2         A.    No, I don't.

3         Q.    When did you first find out

4    about the Allergan ad?

5         A.    The year it ran, which right

6    now I can't even remember if it was 2013,

7    20 -- I have no idea.  I think it was

8    around 2013.  I can't even tell you the

9    time of the year.

10             What I can tell you is I was

11   working at Bergdorf Goodman and I had both

12   clients and models telling me, yay,

13   congratulations on your Botox ad.  And I

14   was like what?  Yeah, I saw you on the

15   Botox campaign.  That must be great.  And I

16   said it must be someone that looks like me

17   because I never worked for Botox before.

18   And I didn't think anything about it until

19   somebody actually handed me a screenshot.

20             And I was, like, yes, that is

21   actually me.  You are correct.  And then

22   that raised a big question, like, how did

23   that picture get appropriated by Botox,

24   which is what I thought it was at the time?

25             Turns out it is Brilliant

```
 1              E. PASSELAIGUE - Confidential
 2                 D E C L A R A T I O N
 3
 4         I hereby certify that having been
 5    first duly sworn to testify to the truth, I
 6    gave the above testimony.
 7
 8         I FURTHER CERTIFY that the foregoing
 9    transcript is a true and correct transcript
10    of the testimony given by me at the time
11    and place specified hereinbefore.
12
13
14
15              _____
16                   ELODIE PASSELAIGUE
17
18    Subscribed and sworn to before me
19    this _____ day of _____ 20____.
20    _____
21         NOTARY PUBLIC
22
23
24
25
```

1              E. PASSELAIGUE - Confidential

2                   E X H I B I T S

3

  DEFENDANT'S EXHIBITS

4

  EXHIBIT      EXHIBIT                        PAGE

5

  NUMBER       DESCRIPTION

6

  1            Complaint                      11

7

  2            Document demands               12

8

  3            Answers to Defendants'         18
9              First Set of
               Interrogatories
10

  4            Answers to Defendants'         23
11             Request for Admission

12  5          Karin Models Vendor            66
               Balance Detail sheet
13

  6            Financial Activity from        71
14             1/1/08 to 12/31/08

15  7          Form 100 from 2013             80

16  8          Form 1099s for 2014            85

17  9          Form 1099 for 2015            93

18  10         Ford Models management        109
               contract
19

  11           Model Release                 115
20

  12           Model Release                 117
21

  13           Model Release with            117
22             redactions

23             (Exhibits retained by Counsel.)

24

25

1                E. PASSELAIGUE - Confidential

2                     I N D E X

3   EXAMINATION BY                        PAGE

4   MR. SHOLDER                           6

5

6

7

8     INFORMATION AND/OR DOCUMENTS REQUESTED

9    INFORMATION AND/OR DOCUMENTS        PAGE

10  Call sheets                          14

11  Ms. Passelaigue's signature and      22

12  verification

13  E-mail exchanges with Wilhelmina     93

14  Model release                        107

15

16

17

18

19

20

21

22

23

24

25

1              E. PASSELAIGUE - Confidential

2                  C E R T I F I C A T E

3

4   STATE OF NEW YORK       )
                            :  SS.:
5   COUNTY OF NEW YORK      )

6

7          I, JOSHUA B. EDWARDS, a Notary Public

8   for and within the State of New York, do

9   hereby certify:

10          That the witness whose examination is

11  hereinbefore set forth was duly sworn and

12  that such examination is a true record of

13  the testimony given by that witness.

14          I further certify that I am not

15  related to any of the parties to this

16  action by blood or by marriage and that I

17  am in no way interested in the outcome of

18  this matter.

19          IN WITNESS WHEREOF, I have hereunto

20  set my hand this 28th day of August 2018.

21

22              _Joshua B. Edwards_
                _____
23              JOSHUA B. EDWARDS, RDR, CRR

24

25