# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELODIE PASSELAIGUE, on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>            v.<br><br>GETTY IMAGES (US), INC., BILL DIODATO PHOTOGRAPHY, LLC, and BILL DIODATO,<br><br>    Defendants. | **FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u><br><br>DESIGNATED FOR ASSIGNMENT TO MANHATTAN |

Plaintiff Elodie Passelaigue, on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, hereby brings this First Amended Complaint[1] against Getty Images (US), Inc., Bill Diodato Photography, LLC ("Diodato Photography"), and Bill Diodato, and alleges the following upon her own knowledge, or where she lacks personal knowledge, upon information and belief, including the investigation of her counsel.

## <u>NATURE OF ACTION</u>

1.      This action involves an unscrupulous photographer, Bill Diodato, combined with a reckless stock photography house, Getty Images, who together have taken unfair advantage of fashion industry models, violating their rights of publicity by

---

[1] In amending the complaint to align with the Court's March 1, 2018 Opinion & Order regarding defendants' Motion to Dismiss (Dkt. No. 74), plaintiff does not waive her rights to appeal the findings of that Order, or any other Orders of this Court.

commercializing their images on the basis of fraudulent "model releases" and false claims of licensing rights. Indeed, Diodato and Getty know full well that they have no such rights, so instead, under the veneer of releases identifying Diodato as the photographer, or not identifying a photographer at all, Getty enabled Diodato to conceal his identity as photographer of hundreds of images by advertising them for licensing on Getty's website under the fictitious name of a non-existent photographer called Adrianna Williams – which is nothing more than a combination of the names of Diodato's daughter and son.

2.      Plaintiff Elodie Passelaigue, an internationally-renowned fashion model, learned of this fraud after her image from a modeling assignment for which Diodato was the photographer found its way years later through Getty into a Botox advertising campaign, despite the fact that Ms. Passelaigue never modeled for Botox, and never even used Botox. Not only has Ms. Passelaigue not been compensated modeling and licensing fees for the Botox campaign, or for any other uses resulting from Getty's licensing of her image, but use of her image for such a synthetic injectable cosmetic medicine could seriously damage her career.

3.      Plaintiff brings this action on behalf of herself and others similarly victimized by defendants' practices, to enjoin defendants' use of images to which they have no commercial rights, to ensure a more robust image intake vetting process to prevent continuing and future injury, and to recover damages.

## THE PARTIES

4.      Plaintiff Elodie Passelaigue is a resident of New York, New York.

5.     Defendant Getty Images (US), Inc. is a New York corporation with its principal place of business located at 75 Varick Street, New York, NY 10013.

6.     Defendant Bill Diodato Photography, LLC ("Diodato Photography" or "LLC") is a New York limited liability company with its principal place of business at 433 W 34th St #17B, New York, NY 10001, and is the alter ego of defendant Bill Diodato, among other things because Bill Diodato is the sole owner of or otherwise completely controls the LLC, which has failed to observe the necessary corporate formalities, and the LLC's acts are the acts of Bill Diodato.

7.     Defendant Bill Diodato is a resident of New York, New York, is the alter ego of defendant Bill Diodato Photography, LLC, and personally authorized, approved, committed, actually participated in and is the principal force behind the acts complained of herein.

## JURISDICTION AND VENUE

8.     The Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338 because Plaintiff asserts claims arising under Section 43(a) of the U.S. Lanham Act, 15 U.S.C. § 1125(a).

9.     The Court also has federal diversity jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A), because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a state different from defendants. In addition, more than two-thirds of the members of the class reside in states other than

the states in which defendants are citizens and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

10.     The Court has personal jurisdiction over Getty Images (US), Inc. because it is a New York corporation with offices at 75 Varick Street, New York, New York 10013. Further, it transacts business in New York, NY, and throughout the United States, including without limitation through online marketing intended to reach consumers in New York. Moreover, it has sufficient purposeful, systematic, and continuous minimum contacts with the various states of the United States, including New York, and has sufficiently availed itself of the markets of various states of the United States, including New York, to render the exercise of personal jurisdiction by this Court permissible.

11.     The Court has personal jurisdiction over Diodato Photography, LLC because it is a New York limited liability company with its principal place of business located at 433 W 34th St. #17B, New York, NY 10001. Further, Diodato Photography transacts business in New York, and throughout the United States, including without limitation through online marketing intended to reach consumers in New York. Moreover, Diodato Photography has sufficient purposeful, systematic, and continuous minimum contacts with the various states of the United States, including New York, and has sufficiently availed itself of the markets of various states of the United States, including New York, to render the exercise of personal jurisdiction by this Court permissible.

12.     The Court has personal jurisdiction over Bill Diodato because he resides in New York.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because a defendant resides within this district and defendants are residents of the State of New York (including Getty Images, Inc. as it subject to personal jurisdiction in this State). Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred, and a substantial part of the property that is the subject of this action is situated within this district. Moreover, venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(3) because all defendants are subject to personal jurisdiction here.

### DIVISION

14.     This case should be assigned to Manhattan as it is a civil case other than those specified in Local Rule 18(a)(i)-(iv).

### FACTS

## I.     ELODIE PASSELAIGUE'S MODELING CAREER

15.     Plaintiff Elodie Passelaigue is a professional, internationally-renowned fashion model.  In the past, she has been represented by prominent modeling agencies including Wilhelmina Models, Visage Management (Zurich), Group Model Management (Barcelona), Louisa Models (Munich), Next Model Management (Montreal), Elite Models (Toronto and New York), and Ford Models (New York).

16.     Ms. Passelaigue has been photographed by many of the world's leading fashion photographers. Her client list is a virtual "who's who" of high-end fashion and

beauty icons, including Cartier, Christian Dior, Yves St. Laurent, Giorgio Armani, Hermes, Harry Winston, Vera Wang, and Prada.

17.     In the early 2000s, Ms. Passelaigue was cast to work for beauty giant Clinique. Her work for Clinique quickly gained widespread international popularity. Since that time, Ms. Passelaigue has been featured in several Clinique television commercials, and remains one of the most recognized faces of Clinique.

## II.     THE AVON SHOOT

18.     In 2003, Ms. Passelaigue was cast to work for Avon. Diodato was the photographer at that photo shot, which took place on May 29, 2003, although Ms. Passelaigue does not remember him from that shoot.

19.     Diodato has never asked to use, and Ms. Passelaigue has never consented to his use of any of the photographs taken at the Avon shoot for any purpose. There is no model release purporting to convey Diodato or Getty the right to use any of the Avon photographs.

20.     Nevertheless, Diodato conveyed the below image of Ms. Passelaigue, taken at the Avon shoot, to Getty. In doing so, Diodato falsely represented to Getty that Ms. Passelaigue had signed a model release for the image. Getty thereafter made the image available for license through its website, identifying it as "Creative #: 10343251," and representing that it was "available for all permitted uses" under its licensing terms.



## III.   THE CLINIQUE UNDERWATER TEST SHOOT

21.     One advertising campaign for which Clinique was interested in hiring Ms. Passelaigue in early 2004 was expected to involve images of her in water, showing part of her face above water, with part of her face and neck underwater.

22.     Because of this somewhat unusual use of water, before setting up an actual campaign shoot (which would have required the use of many people, over several days, in Paris), Clinique arranged to have sample photos taken in New York simply to test lighting and other conditions, and thereby determine the feasibility of shooting such images for the actual campaign.

23.     Although the actual shoot would be done by a well-known still life photographer who regularly shot for Clinique's international campaigns, for the New York test shoot Clinique hired a local photographer, defendant Bill Diodato.

24.     On February 9, 2004, Ms. Passelaigue posed for the Clinique underwater test photos in New York, which were taken by Diodato.

## III.   THE SPIEGEL SHOOT

25.     On June 11, 2009, more than five years after the Clinique underwater test shoot, Ms. Passelaigue was hired to do a photo shoot in New York for Spiegel, a women's clothing and accessory company.  Diodato was the photographer.

26.     At some point during the shoot, Diodato approached Ms. Passelaigue and tried to remind her that they met on the Clinique underwater test shoot years before. She recalled only the shoot, but not Diodato as the photographer.

27.     Although Spiegel hired Ms. Passelaigue only for "waist down" photos, at the shoot Diodato also took headshots of Ms. Passelaigue.

*     *     *

28.     At some point, Ms. Passelaigue signed a Model Release relating to the Clinique Underwater Shoot images. Ms. Passelaigue does not recall precisely when she signed the Model Release. She does, however, recall Diodato asking her whether he could use the Clinique photographs only for his portfolio and professional website as examples of his work and stating that, if she was willing to allow such use, she just needed to sign the Model Release form.

29.     As a professional courtesy, and for no monetary or other consideration of any kind, Ms. Passelaigue told Diodato she was willing to allow him to use the Clinique photos from that day, but only for his portfolio and website.

30.     Indeed, Ms. Passelaigue believed she did not own the photos or any rights to commercial exploitation of these images, but that her client that set up and paid for the shoot owned all such rights to the resulting photos.

31.     Based on his industry experience, Diodato similarly knew or at least reasonably should have known that Ms. Passelaigue did not own or have rights to commercially market these photos, and could only agree, at most, to the type of photographer portfolio/website use of her image as was customary in the industry as an example of a photographer's work.

32.     After Ms. Passelaigue agreed to allow Diodato to use the Clinique shots only for his portfolio and website, Diodato directed her to sign the "Model Release" document where indicated, which she did.

33.     Diodato also directed Ms. Passelaigue to fill in only a few additional items where indicated, specifically her name, address, phone number, email address, and date of birth, which she did. Ms. Passelaigue was not directed to, and did not date the release under her signature and name where indicated.

34.     On information and belief, when Ms. Passelaigue viewed the Model Release at the time she signed it, the "description of shoot" was listed as "Clinique Underwater Shoot," but it contained no signature of any witnesses, did not set forth the "Date" of Ms. Passelaigue's signature where indicated, and did not "Attach a Copy of a Photo ID or Visual Reference" where indicated. When signing, Ms. Passelaigue understood she was

releasing only noncommercial rights to the Clinique photos so that Diodato could use them on his website and in his portfolio in a noncommercial manner.

35.     Ms. Passelaigue does not recall Diodato mentioning any other photo shoots, aside from Clinique, when asking her to sign the Model Release and, because the "Description of Shoot" said "Clinique Underwater Shoot," and the "Copy of a Photo ID or Visual Reference" section was blank when Ms. Passelaigue signed, there was no indication the Model Release would apply to any photographs other than the ones discussed from the Clinique shoot. It would also go against industry standards and practices for a single release to apply to multiple photo shoots, taken years apart for different clients, while the model was represented by different agents.

## IV.   DIODATO AND GETTY MISAPPROPRIATE PLAINTIFF'S IMAGE

36.     In approximately late July 2014, Ms. Passelaigue learned for the first time that headshot images of her were being used in an advertising campaign for Botox, a prescription-only medicine manufactured by pharmaceutical giant Allergan, which is injected into muscles and used to temporarily improve the appearance of moderate to severe "crow's feet" lines and frown lines between the eyebrows.

37.     Ms. Passelaigue first learned of Allergan's use of her image to advertise Botox when someone asked if she had ever modeled for Botox, and despite that Ms. Passelaigue never did, insisted that her picture was on a Botox website. Ms. Passelaigue responded that was not possible, at which point she was shown a website page for something called "Brilliant Distinctions," that advertised Botox with a photo of Ms.

Passelaigue. In the days following, others also pointed out that Ms. Passelaigue was now modeling for Botox.

38.    Ms. Passelaigue never worked as a model for Allergan to advertise any of its products, including Botox. Yet her image was being used on an Allergan website, www.skinmedica.com, belonging to "SkinMedica, an Allergan Company" for its "Brilliant Distinctions" Membership Program:



39.    The SkinMedica web pages containing Ms. Passelaigue's image advertise Botox and other synthetic Allergan products, such as Latisse, an FDA-approved ophthalmic solution to grow eyelashes for those who cannot grow lashes or long enough lashes; Juvaderm, an injectable gel to temporarily add volume and skin to areas of facial wrinkles and folds, especially around the nose and mouth; and Natrelle Breast Implants (silicone-filled and saline-filled) for breast augmentation.



40.     In addition, after falsely suggesting that Ms. Passelaigue is at least "in [her] 40s," these website pages depicting Ms. Passelaigue contain statements about "Approved Uses" of Botox and related "Important Safety Information," including for example that "BOTOX Cosmetic may cause serious side effects that can be life threatening." These pages also contain various statements about Latisse (including "[m]ay cause brown darkening of the colored part of the eye which is likely permanent"), as well as many precautionary and other warnings regarding Juvederm and Natrelle Breast Implants.



41.    A true and correct copy of selected pages from Allergan's SkinMedica website demonstrating Allergan's use of Ms. Passelaigue's image is attached hereto as **Exhibit 1**.

42.    Allergan used Ms. Passelaigue's image to advertise Botox and related products, despite that Ms. Passelaigue never has used Botox or any other Allergan synthetic product, and did not authorize Allergan to use her images in any manner.

43.    Because Allergan had never hired Ms. Passelaigue, she was confused about how it obtained the photos of her. When she initially saw the Botox advertisement

featuring her image, she did not recognize the photo as having come from a particular photo shoot or relating to a particular client.

44.     Ms. Passelaigue was quite concerned. Not only was her image being used for commercial purposes to sell synthetic cosmetic medicines by a company that never hired her or otherwise paid for her modeling services, but depending on the circumstances, such use might violate contracts she had with her actual clients, or otherwise compromise and damage those relationships and her career.

45.     Ms. Passelaigue was especially concerned that Allergan's use of her image to advertise Botox and other synthetic cosmetic products would seriously interfere with her prospective assignments for companies that market "natural" cosmetic, skincare, and other beauty products.  In fact, it is generally understood in the industry that Allergan regularly advertises Botox with models who have used Botox, while other companies maintain policies or practices precluding the hiring of models who are believed to have used synthetic beauty products like Botox.

46.     Ms. Passelaigue contacted her agent, who knew that Grey Advertising was the ad agency for Botox. Grey Advertising informed Ms. Passelaigue's agent that it had licensed the image from Getty.

47.     Ms. Passelaigue's agent then contacted Getty in New York.   Getty represented to Ms. Passelaigue's agent that it had a valid release for her photographs. Insisting that it needed to protect the photographer's identity, in August 2014, Getty sent

to Ms. Passelaigue's agent only a redacted copy of a purported "Model Release," as depicted below (and attached hereto as **Exhibit 2**).



48.     The redacted Model Release contained Ms. Passelaigue's signature and written name, both of which Ms. Passelaigue recognized as her handwriting. But it also contained a handwritten date of "6-11-09" under her name, and the handwritten phrase "Clinique Underwater Shoot & Spiegel Beauty" on the line designated for "Description of Shoot," neither of which was her handwriting.

49.    As shown above, and in greater detail below, the Model Release provided by Getty contained two photos of Ms. Passelaigue.



50.    Ms. Passelaigue immediately recognized one photo, appearing on the right, from the Clinique underwater test shoot assignment. The other photo, appearing on the left, Ms. Passelaigue recognized as having come from the same photo shoot as the photo being used by Allergan to advertise Botox, but she still was unable to associate the photo with a specific prior client assignment or photo shoot.

51.    The identification of "Spiegel Beauty" in "Description of Shoot" was a possible clue as to the origin of this other photo, and Ms. Passelaigue's former agent at Ford Models confirmed that the Spiegel shoot occurred on June 11, 2009.  But Ms.

Passelaigue remained confused because her former agent also identified the Spiegel shoot as "waist down" only.

52.     Further, as Ms. Passelaigue has always understood, it is totally inappropriate and unheard of in the industry for the same release to cover two different shoots, for two different clients, on two different dates – indeed five years apart – and especially with those shoots during times while being represented by two different agents at two different modeling agencies.

53.     Ms. Passelaigue's agent (and/or her agent's attorney) eventually convinced Getty to identify the supposed photographer of the image used for the Botox advertising. Yet Getty continued to conceal Diodato's identity by falsely representing that the photographer was Adrianna Williams. At about the same time, Ms. Passelaigue discovered photos of herself on Getty's website being offered for sale or license, including one apparently from the same shoot as the photo used by Allergan to advertise Botox and two photos from the Clinique underwater test shoot, as depicted on the following page:

[continued on following page]



54.     These photos, along with photos of countless other models, were on Getty website pages identifying the photographer of these shots as Adrianna Williams.  But Ms. Passelaigue had never worked with a photographer named Adrianna Williams.  Ms. Passelaigue's agent asked other models if they had ever worked with or even heard of a photographer named Adrianna Williams.  None had.

55.     Ms. Passelaigue searched online for "Adrianna Williams" and could not find any professional website for a photographer by that name. This is totally contrary to the standard uniform practice in the industry for photographers to maintain a professional website to showcase examples of their work (indeed, the exact type of use that Diodato pretended he would make of Ms. Passelaigue's images).

56.     At about the same time, Ms. Passelaigue determined that the photographer for the Clinique underwater test shoot was Diodato, not Adrianna Williams.

57.     Ms. Passelaigue retained an attorney, who eventually persuaded Getty to provide an unredacted copy of the Model Release on April 17, 2015, attached as **Exhibit 3**. Until receiving the unredacted copy of the Model Release, Ms. Passelaigue could not be certain that it was Bill Diodato who had conveyed her images to Getty, nor could she fully investigate the circumstances surrounding her signing the Model Release or her claims against defendants, as Bill Diodato's identity was a key component to unraveling how her images ended up on the Getty website being offered for license.

58.     Ms. Passelaigue, including through her agent and attorney, was diligent in seeking to uncover the true identity of Adrianna Williams and in trying to obtain an unredacted copy of the Model Release.

59.     As depicted below, the unredacted Model Release (provided by Getty in higher resolution than the initial, redacted version), identifies in handwriting the "Photographer" as "Bill Diodato." It contains his apparent signature, as well as the signatures of two purported "witness[es]." One of the witnesses is identified in handwritten form under a signature as "Lauren Benward – witness" followed by "6/11/09" also in handwriting.

///

///

///

///

**MODEL RELEASE**

[ATTACH A COPY OF A PHOTO ID OR VISUAL REFERENCE HERE]





For good and valuable consideration that I acknowledge as received,  and with the intent to be legally bound, by signing this   release   I   hereby   irrevocably   grant   to _____, ("**Photographer**"), his/her affiliates, licensees, agents and assigns (and their respective   licensees   and   assigns)   ("**Assigns**"),   the unrestricted right to use my appearance, form, likeness and voice, or that of the minor named below (if applicable), contained in the photographs, film, or recording of me (or the named minor, if applicable) by Photographer as part of a shoot described below ("**Images**"), and to distribute such Images for editorial, trade, advertising, packaging or other purposes in any manner or medium (including without limitation broadcast, online and print), whether now or hereafter devised, throughout the world, in perpetuity. I understand Photographer may contract with a stock agency and that the Images may be included in stock files. I further understand and agree that the Images may be modified, altered, cropped and combined with other content such as images, video, audio, text and graphics.

I waive any right to the Images, including the right to inspect or approve any use of the Images and any additional money or consideration for any use of the Images. I acknowledge and agree that this release is binding on my heirs and assigns, and that the personal information provided by me to Photographer as part of this release may be used and disclosed by the Photographer and his/her Assigns for the purposes of selling, licensing and distributing my likeness for commercial purposes and confirming my consent.  I expressly release Photographer and his/her Assigns from and against any and all actions, liabilities, losses, demands or claims that I have or may in the future have for rights of publicity, invasion of privacy, defamation, libel or slander and/or any other tort or cause of action arising out of any use of the Images, even if such use is unflattering, embarrassing or objectionable to me.  In any event, I agree that my monetary damages awarded against Photographer or his/her Assigns if any, shall not under any circumstances exceed $US 500.00.

Please check one of the following boxes (as applicable):

☒ I represent and warrant that I am at least eighteen years of age, am competent and have authority to execute this release.

☐ **If parent or guardian is executing on behalf of a minor appearing in image**: I represent and warrant that I am at least eighteen years of age and have full legal capacity to execute this release of rights in the Images for the following minor:   Full name of minor: _____

Description of Shoot:   CLINIQUE   UNDER WATER SHOOT & SPIEGEL BEAUTY

For Photographer Only:

Photographer's Signature

BILL DIODATO
Printed Name

_Jacob Jordan_

witness

_Lauren Benward_ witness
6/11/09

Rev'd 6-18-07

For Model Only (Required):

Model's Signature (or Parent/Guardian of Minor)

Elodie PASSELAIGUE
Printed Name

6-11-09
Date

395 South end ave #14G
Model's Address   NY - NY - 10080. USA

(917) 334 5941
Model's Phone No.

elodiepass@ hotmail.com
Model's Email

24th of July   1980
Model's Date of Birth

60.     Ms. Passelaigue has always understood it is customary in the industry that releases are not signed for multiple shoots at once, particularly where they occurred years apart, and were for different clients.

61.     Moreover, as is standard for someone born and raised in France, Ms. Passelaigue would have written "11-6-09" or more likely "11th of June 2009" (not 6-11-09) under her signature if she was identifying the date of June 11, 2009. For example, on the Model Release line for "Model's Date of Birth," Ms. Passelaigue wrote "25th of July 1980."

62.     After finally realizing that Diodato and Getty were responsible for the unauthorized use of her image by Allergan to advertise Botox and other synthetic cosmetic products, Ms. Passelaigue inquired among others in the industry and determined that many other professional models with their images on Getty's website under the fictitious Adrianna Williams name claimed to have been similarly wronged by Diodato.

63.     Compounding the problem experienced by Ms. Passelaigue and class members, Getty's image intake process is insufficient to protect against the unlawful use of Plaintiff's and class members' images.

### DEFENDANTS' UNLAWFUL ACTS

## I.     AS TO DIODATO & DIODATO PHOTOGRAPHY

64.     Diodato (including through his alter ego, Diodato Photography) induced Ms. Passelaigue into signing the "Model Release" form by falsely representing that he would

use photos from Clinique only for his portfolio and website, merely as an example of his work.

65.     At the time he made the promise and induced Ms. Passelaigue to sign the Model Release form, Diodato knew that he would not limit his use of her images to his portfolio and professional website as he had promised, but instead would use her images for direct commercial gain, without providing any consideration to Ms. Passelaigue.

66.     Diodato did not request, and Ms. Passelaigue did not voluntarily agree to release any rights to photographs taken during the 2009 Spiegel shoot. Rather, after Ms. Passelaigue had signed the Release in relation to Clinique only, Diodato or someone acting on his behalf, added "& Spiegel" to the "Description of Shoot" line of the Release, then later conveyed images from both the Clinique and Spiegel shoots to Getty.

67.     In order to better conceal his behavior, as he did with photos of Ms. Passelaigue, Diodato routinely used the pseudonym "Adrianna Williams" (an amalgamation of the names of his daughter, Adrianna, and his son, William) as the name of the supposed photographer for images of professional models to which Diodato actually has no commercial licensing rights (the "Unauthorized Photos").

68.     Upon information and belief, sometime starting in approximately late 2015 and ending no later than mid-2016, all photos listed under the pseudonym Adrianna Williams were corrected to identify Bill Diodato as the photographer. A current search of Getty's website revealed 3,463 images attributable to Bill Diodato.

69.     To plaintiff's knowledge, nothing prevents Getty from listing future images submitted by Diodato, nor from once again listing the images currently credited to Bill Diodato, under the pseudonym Adrianna Williams.

70.     Diodato is aware when he submits, conveys, or otherwise transmits unreleased photos to Getty under the pseudonym Adrianna Williams or his real name, that he has no legitimate commercial licensing rights in the images, and that Getty will use the images commercially, advertising them for sale or license to others, such as Allergan.

71.     Diodato profits from his unlawful use of the Unauthorized Photos.

## II.     AS TO GETTY

72.     Getty Images is a stock photography agency. It maintains an archive of over 80 million images and illustrations, which it licenses to others for a fee. Licenses by entities in the U.S. are provided by Getty Images, Inc. through its subsidiary Getty Images (US), Inc.  In fact, in its "Rights-Managed and Rights-Ready Image and Video License Agreement," Getty Images, Inc. states that (i) the license agreement is between the licensee or purchaser and "an affiliate of Getty Images, Inc.," (ii) "[t]he affiliate of Getty Images identified in Section 11.10 below will be the party entering into this Agreement," and (iii) "[t]he licensing entity under this Agreement shall be determined by the billing address of the Licensee or, if any, Purchaser…."  For licensee/purchaser's located in the United States, the "Getty Images Licensor" is identified as "Getty Images (US), Inc."

73.     Getty represents publicly that it owns the right to license these images and illustrations.

74.     Getty has several tiers of licensing, as well as various subscription products. For example, Getty offers "Royalty-free Images," or "RF," as well as "Rights-Managed Images," or "RM."

75.     Getty's license agreement contains the following warranty regarding RF Images as well as RM Images "where Getty Images specifically notifies you that a model and/or property release has been obtained:"

> Getty Images warrants that your use of such content in accordance with this agreement and in the form delivered by Getty Images (that is, excluding any modifications, overlays or re-focusing done by you) will not . . . infringe on any trademark or other intellectual property right and[ ] will not . . . violate any right of privacy or right of publicity.

Getty Images Content License Agreement (updated March 2017), ¶ 5.1. Getty's Royalty-free license contains a similar provision.

76.     Getty licensed Ms. Passelaigue's image for use by Allergan (through Grey Advertising) beginning on or about May 28, 2014. Allergan's use, via Getty's purported license, ceased sometime after the filing of this action on February 22, 2016.

77.     Getty has realized substantial licensing fees and profits from Allergan's use of Ms. Passelaigue's image in promoting Botox and other Allergan products. Getty has never compensated Ms. Passelaigue for licensing her image for this or any purpose.

78.     Getty's behavior was and continues to this day to be knowing, intentional, in willful disregard of Ms. Passelaigue's rights, or at the very least, reckless.

79.     The use of such a single "Model Release" to purportedly convey rights to photos from two different advertising campaigns of two totally different companies —

such as Clinique and Spiegel—is so contrary to industry standard practice that it also would put anyone viewing the purported Model Release on reasonable notice that Ms. Passelaigue likely did not sign the document for all three shoots. Moreover, Getty should have noticed that Diodato had conveyed photos, not just from those two shoots, but also from a third (Avon) shoot, which the Release did not even purport to release.

80.    After Diodato provided Getty with the release expressly identifying Diodato as the photographer, Getty posted the photos shown on that release, as well other photos from the Clinique Underwater shoot, Avon shoot and Spiegel shoot, on web pages identifying the photographer by the fictitious name of the non-existent Adrianna Williams.

81.    After providing Ms. Passelaigue with a version of the purported Model Release in which the "Photographer" name "Bill Diodato" was redacted, Getty willfully misrepresented to Ms. Passelaigue's agent (and/or her agent's attorney) that the photographer was actually Adrianna Williams, who does not even exist, thereby furthering its deception through the knowing, intentional, active, and continued concealment of Diodato's identity.

82.    Despite being advised expressly that the purported Model Release is fraudulent, Getty continued to license Ms. Passelaigue's image to Allergan, and to publicize photographs from her Clinique, Spiegel, and Avon shoots on its website, offering them to others and falsely holding itself out as having the legal right to license her images to third parties. Getty removed Ms. Passelaigue's images from its website

sometime after February 22, 2016, but has made no commitment to refrain from offering to license them again in the future.

83.     By placing Getty on actual, express notice as to this situation, Ms. Passelaigue, her agent, her agency's attorney, and her own attorney have also reasonably put Getty on notice that many other persons' photos, perhaps hundreds, that it obtained from Diodato are unauthorized, and that Getty has no legitimate right to their use and commercial exploitation.

84.     Getty has not in any manner compensated plaintiff or class members whose images it has unlawfully advertised and/or licensed, or for which Getty otherwise falsely claims commercial rights.

## PLAINTIFF'S INJURY

85.     The following images of plaintiff were conveyed by Diodato to Getty for licensing, and were offered for license by Getty until approximately February 24, 2016 (two days after the original Complaint was filed in this action):

[continued on following page]






  



86.     Plaintiff has been injured by defendants' misappropriation of her likeness, violation of her right of publicity, false representations, unfair competition and other unlawful conduct, in various ways, including the following.

87.     First, defendants' unlawful behavior has caused Ms. Passelaigue to be falsely associated with Allergan and its synthetic beauty products, including Botox, and falsely associated with Getty and its stock photography business, causing damage to her reputation and prospective business relationships and opportunities.

88.     Second, plaintiff has lost the professional fees she would have been paid if Allergan and other entities that have licensed her images from Getty had properly hired her as a model.

89.     Third, plaintiff has lost usage fees she would have received if Allergan and other entities had legitimately licensed her images in an authorized manner.

90.     Fourth, the market for plaintiff's images—in which she, in offering her services as a professional fashion model, competes—has been diminished through defendants' unlawful behavior. Among other things, by publicizing that Ms. Passelaigue's images are supposedly available through Getty as stock photography, for licensing fees that are substantially lower than the professional fees she typically commands for providing modeling services to companies like Allergan, defendants have lowered the demand and value for her services, including by removing some of the "cache" associated with her international renown.

91.     Fifth, plaintiff is at risk of continuing injury because she continues to model professionally and has no guarantees Defendants will not license further images of her without consent, nor have Defendants agreed not to license her images from the Avon, Clinique and Spiegel photo shoots again at some point in the future. The form Model Release provided by Getty is also periodically revised, and does not indicate that it is a Getty form, such that plaintiff may unknowingly encounter a Getty Model Release in the future and not understand that signing such a document will results in her images being available for license on Getty's website. Nor do Diodato's and Getty's image submission

process contain the necessary checks and balances to ensure thatPplaintiff's images are not inadvertently uploaded for license through Getty without a valid model release.

## CLASS MEMBERS' INJURY

92.    Like plaintiff, other class members have been injured by defendants' unlawful conduct.

93.    Class members have lost the professional fees they would have been paid if they had been properly hired as models by Getty's customers.

94.    Class members have lost usage fees they would have been paid if defendants had licensed (and sublicensed) their photos in an authorized manner.

95.    By making class members' images available at licensing fee rates representing a discount on the professional fees class members would otherwise demand, defendants have diminished the market and value for their services.

96.    Class members' reputations—and thereby their prospective business relationships and opportunities—have been diminished by defendants' unlawful practices, including through their false association with Getty, a stock photography house.

97.    Class members are also at risk of continuing and future injury because Getty continues to license their images for commercial use without consent. The form model release provided by Getty does not indicate that it is a Getty form, such that class members may unknowingly sign such a document resulting in their images being available for license on Getty's website. Nor does Getty's image submission process contain the

necessary checks and balances to ensure that plaintiff's images are not inadvertently uploaded for license through Getty without a valid model release.

## CLASS ACTION ALLEGATIONS

98.     Pursuant to Federal Rule of Civil Procedure 23(b)(3), plaintiff seeks to represent a class of all persons in the United States who are professional models whose photographs were taken by or on behalf of Diodato (including through Diodato Photography) and then conveyed to Getty without a valid model release.

99.     Pursuant to Federal Rule of Civil Procedure 23(b)(2), plaintiff seeks to represent a class of all persons in the United States who have signed or may in the future sign a model release purporting to give Getty the right to license their images.

100.     Notwithstanding the preceding paragraphs, plaintiff may modify the class definitions in any manner consistent with information learned during discovery, prior to or in connection with her anticipated class certification motion.

101.     The members of the proposed class(es) are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all class members in a single action will provide substantial benefits to the parties and Court.

102.     Questions of law and fact common to plaintiff and the class(es) include, but are not limited to the following:

       a.     Whether Diodato has conveyed to Getty purported rights to commercialize photographs of professional models taken by him or on his behalf

(including through Diodato Photography) in a manner by which the photographer has been identified by the pseudonym Adrianna Williams;

      b.      Whether Diodato purported to convey to Getty, for its subsequent use and advertising, and license to others, photographs for which Diodato had no commercial rights to convey;

      c.      Whether Getty was aware that Diodato had no commercial rights in the Unauthorized Images to convey, including because it knew of his use of the pseudonym Adrianna Williams;

      d.      If Getty was not aware that Diodato had no commercial rights in the photographs he conveyed to Getty under the pseudonym Adrianna Williams, whether Getty reasonably should have known, and whether it otherwise acted negligently or recklessly in this regard;

      e.      Whether defendants misappropriated class members' likenesses;

      f.      Whether defendants have engaged in negligence;

      g.      Whether defendants have engaged in false advertising, false representations, false designations, unfair competition and other unlawful practices that violate class members' rights;

      h.      The proper equitable and injunctive relief;

      i.      The proper amount of actual or compensatory damages;

      j.      The proper amount of restitution or disgorgement;

      k.      The proper amount of punitive damages; and

l.     The proper amount of reasonable litigation expenses and attorneys'
fees.

103.   Plaintiff's claims are typical of class members' claims in that they are based
on the same underlying material facts, events, and circumstances relating to defendants'
conduct.

104.   Plaintiff will fairly and adequately represent and protect the interests of the
class(es), has no interests incompatible with the interests of the class(es), and has retained
counsel competent and experienced in class action and intellectual property litigation.

105.   Class treatment is superior to other options for resolution of the controversy
because the relief sought for each class member is sufficiently small such that, absent
representative litigation, it would be infeasible for class members to redress the wrongs
done to them.

106.   Questions of law and fact common to the class(es) predominate over any
questions affecting only individual class members.

107.   As a result of the foregoing, class treatment is appropriate under Fed. R. Civ.
P. 23(a), (b)(2), and (b)(3).

[continued on following page]

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## MISAPPROPRIATION OF LIKENESS, N.Y. CIV. RIGHTS LAW § 51

### (*By Plaintiff, on Behalf of Herself and the Class, Against Getty and Diodato*)

108.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

109.    Defendant Getty used for purposes of advertising and trade, and defendant Diodato used at least for purposes of trade, within the State of New York, plaintiff's and class members' portraits and/or pictures, without valid written consent.

110.    Upon information and belief, including the nature of Getty's business of licensing images for use by advertisers, defendants Getty and Diodato have contributed to use by others of plaintiff's and class members' portrait and/or picture within the State of New York for purposes of advertising and trade without valid written consent.

111.    Defendant Diodato knowingly engaged in the prohibited use of plaintiff's and class members' portraits and/or pictures, and in the prohibited contributory use of plaintiff's and class members' portraits and/or pictures.

112.    Defendant Getty knowingly or at least recklessly engaged in the prohibited use of plaintiff's and class members' portraits and/or pictures, and in the prohibited contributory use of plaintiff's and class members' portraits and/or pictures.

113.     Plaintiff and class members have sustained injuries by reason of defendants' prohibited use and contributory use by others of plaintiff's and class members' portraits and/or pictures.

114.     Defendants' aforesaid acts constitute intentional and willful misappropriation of likeness in violation of N.Y. Civ. Rights Law § 51.

115.     Plaintiff, on behalf of herself and other class members, seeks an Order enjoining, preventing and restraining defendants' unauthorized use of their portraits and/or pictures, and awarding damages and exemplary damages.

## SECOND CAUSE OF ACTION

## NEW YORK UNFAIR COMPETITION

### (*By Plaintiff, on Behalf of Herself and the Class, against Getty and Diodato*)

116.     Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

117.     Getty uses in interstate commerce, in connection with advertising, offering for sale, and selling goods and services (including in the form of licenses), false, deceptive and/or misleading descriptions or representations of fact, including that Getty has the right to sell or license plaintiff's and class members' portraits and/or pictures.  Defendant Diodato has engaged in contributory false, deceptive, and/or misleading descriptions or representations of fact, by enabling Getty to do so.

118.     Getty's false, deceptive, and/or misleading descriptions or representations of fact are likely to confuse and deceive, and do actually confuse and deceive relevant

consumers, including purchasers of professional modeling services, as to the affiliation, connection, or association of plaintiff and class members with Getty, and as to the nature, characteristics, and qualities of its goods, services, or commercial activities.

119.    Diodato uses in interstate commerce, in connection with advertising, offering for sale, and selling goods and services (including in the form of commercial rights to portraits and/or pictures), false, deceptive and/or misleading descriptions or representations of fact, including that he has the right to sell commercial rights to plaintiff's and class members' portraits and/or pictures.

120.    Diodato's false, deceptive, and/or misleading descriptions or representations of fact are likely to confuse and deceive, and do actually confuse and deceive relevant consumers, including purchasers of commercial rights to portraits and/or pictures, as to his alleged ownership of such commercial rights.

121.    Diodato knowingly engaged in the aforesaid acts, and defendant Getty knowingly or at least recklessly engaged in the aforesaid acts.

122.    Plaintiff and class members have sustained injuries by reason of defendants' aforesaid acts.

123.    Defendants' aforesaid acts constitute intentional and willful false, deceptive, and/or misleading descriptions or representations of fact in violation of New York unfiar competition law.

124.   Plaintiff, on behalf of herself and other class members, seeks an Order enjoining defendants' unlawful acts and practices, and awarding actual damages, treble damages, punitive damages, and attorneys' fees.

## THIRD CAUSE OF ACTION

## VIOLATION OF THE LANHAM ACT, 15 U.S.C. §§ 1125 *ET SEQ.*

## False Advertising, False Representation, False Designation, False Endorsement and Association, Unfair Competition

### (*By Plaintiff, on Behalf of Herself and the Class, against Getty and Diodato*)

125.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

126.   As an internationally-renowned model, plaintiff is well known and/or recognizable among advertisers and other purchasers of professional modeling services, as well as members of the modeling, fashion and beauty industries, and purchasers of fashion, beauty and skin care products.

127.   As a professional high-end fashion model, plaintiff has a valuable commercial interest in her likeness.

128.   Getty uses in interstate commerce in connection with its image-licensing goods and services false or misleading descriptions or representations of fact, including for example that it has the legal right to license or sell for commercial purposes photographs of plaintiff and class members as they are used by Getty on its website.

129.   Getty's aforesaid use of plaintiff's and class members' images and false representations that it has the legal right to license such images for commercial purposes is likely to cause confusion, mistake, or deception as to plaintiffs' and class members' affiliation, connection or association with Getty, among other things that Getty's use is based on a lawful affiliation, connections or association, directly or indirectly, with plaintiff and class members.

130.   Getty's aforesaid use of plaintiff's and class members' images in commercial advertising on its website misrepresents the nature, characteristics, and qualities of Getty's image-licensing goods, services and commercial activities, among other things that Getty has the legal right to license such images for commercial purposes.

131.   Getty's use of the fictitious name Adrianna Williams as the purported photographer of plaintiff's and class members' images on Getty's website pages is likely to cause confusion, mistake or deception as to the origin of plaintiff's and class members' images on Getty's website and as to plaintiff's association and endorsement of Adrianna Williams and Getty Images.

132.   Getty's aforesaid uses of plaintiff's and class members' images, and false or misleading descriptions or representations of fact are likely to cause, and have caused damage to plaintiff and class members.

133.   Diodato has willfully and intentionally contributed to Getty's aforesaid false or misleading descriptions or representations of fact.

134.    Getty's aforesaid acts constitute false advertising, false representations, false designation of origin, false endorsement and association, and unfair competition under 15 U.S.C.§ 1125(a). Such violations are willful or at least reckless.

135.    Getty and Diodato's use of photographs of plaintiff is likely to injure plaintiff's commercial interest in her likeness.

136.    Getty and Diodato are contributorily liable for Allergan's wrongful use of plaintiff's image to advertise Botox and other Allergan products, in violation of 15 U.S.C. § 1125(a).

137.    Plaintiff seeks an Order enjoining defendants from enabling or allowing any further use by Allergan of plaintiff's image, and pursuant to 15 U.S.C. § 1117(a), awarding defendants' profits, plaintiff's damages, increased profits and treble damages, attorneys' fees, and the costs of the action.

138.    Plaintiff, on behalf of herself and other class members, seeks an Order enjoining defendants' violations, and pursuant to 15 U.S.C. § 1117(a), awarding plaintiff and class members defendants' profits, plaintiff's and class members' damages, increased profits and treble damages, attorneys' fees, and the costs of the action.

## **PRAYER FOR RELIEF**

139.    Wherefore, plaintiff, on behalf of herself, all others similarly situated and the general public, pray for judgment against Defendants as to each and every cause of action, including:

a.      An Order declaring this action to be a proper class action, appointing plaintiff and her counsel to represent the class, and requiring Defendants to bear the costs of class notice;

b.      An Order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including a declaration that all Model Releases and other purported agreements ostensibly between Diodato and class members including plaintiff are void or voidable and unenforceable.

c.      An Order requiring Diodato and Getty to identify in detail every location and use of plaintiff's and class members' photographs of which they are aware, including without limitation all contact information for those to whom they have licensed, conveyed or otherwise provided said photographs.

d.      An Order enjoining Diodato from any further use of photographs of plaintiff and class members, requiring Diodato to provide all such images in all forms to plaintiff's counsel, and compelling Diodato to permanently delete all electronic versions of said photographs.

e.      An Order requiring Getty to remove from its site and to no longer advertise, publish or otherwise offer for any purpose photographs or other likenesses of plaintiff and class members.

f.      An Order requiring Getty to contact Grey Advertising and Allergan directly and inform them that there was and is a defect in the chain of licensing title for plaintiff's image being used by Allergan, and requiring Getty to use all efforts

necessary, whether extraordinary or otherwise, to ensure that removal of plaintiff's image from all Allergan advertising is permanent.

g.      An Order requiring Getty to contact all other entities to which it has sold, licensed, or otherwise provided images of plaintiff and class members, and inform them that there was and is a defect in the chain of licensing title for plaintiff's and class members' images, and requiring Getty to use all efforts necessary, whether extraordinary or otherwise, to effectuate immediate and permanent removal of plaintiff's and class members' images from all uses by such entities.

h.      An Order permanently enjoining defendants' from continuing their unlawful acts and practices, and other legal violations.

i.      An Order requiring defendants to engage in a robust corrective advertising campaign to notify the public of their violations and the fact that any use of plaintiff's and class members' images arising in any manner from Getty is unauthorized and unlawful;

j.      An Order requiring defendants to disgorge all monies, revenues, and profits obtained by means of their wrongful and unlawful acts and practices;

k.      An Order requiring defendants to pay all actual and treble damages as permitted under the causes of action alleged herein;

l.      An Order requiring defendants to pay punitive or exemplary damages on any causes of action so allowable;

m.      An Order awarding attorneys' fees and costs; and

n.      An Order providing for all other such equitable and legal relief as may

be just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: November 13, 2018

_____
JACK FITZGERALD (JF 3831)
*jack@jackfitzgeraldlaw.com*
**THE LAW OFFICE OF JACK FITZGERALD, PC**
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, California 92103
Phone: (619) 692-3840
Fax: (619) 362-9555

***Attorney for Plaintiff and the Class***

# Exhibit 1



LOG IN

REGISTER

**REWARD YOURSELF BRILLIANTLY**

Welcome to savings & rewards on our portfolio
of official treatments & products.

**BRILLIANT INSIGHTS**

Trendwatching, travel tips,
fashion intel, fitness 411 & more.

LEARN MORE

**BECOME A MEMBER**

Earn points for savings
on treatments and products.

REGISTER

## BRILLIANT INSIGHTS



Reflect:
Makeup To Go From
Tired To Terrific

READ ARTICLE

SEE MORE

+ Feedback

www.skinmedica.com

ogVacay   SAG Ph   'poo free   Crédit Agric... Assurances   Sample Sales   Time Warner Cable   + Promofly   Google   Bank of America   Amex   Google Maps   Sav

Outlook.com   |   https://w...   |   Amazon.c...   |   static1.sq...   |   sss.nais.o...   |   static1.sq...   |   Google M...   |   Grossesse...

**FREE SHIPPING ON EVERY ORDER**


dica
n Company

 **MY ACCOUNT** ♥

## REGIMEN

## YOUR REWARDS

## SAVE NOW



LY FROM SkinMedica

RASS
EGIMEN

TIMATE
E RESULTS



**BRILLIANT DISTINCTIONS® REWARDS**

The rewards program that helps you save on select Allergan products and services.



**AUTO REPLENIS**

Never run out of you favorite again!

DISCOVER ALLERGAN BRANDS

LOG IN    REGISTER

Click here to see IMPORTANT SAFETY INFORMATION for BOTOX® Cosmetic (onabotulinumtoxinA), JUVÉDERM® XC, JUVÉDERM VOLUMA® XC, LATISSE® (bimatoprost ophthalmic solution) 0.03% and Natrelle® Breast Implants below.



🏠    BRILLIANT INSIGHTS    EXPLORE *BRILLIANT DISTINCTIONS*®

FIND A DOCTOR

**REFLECT:
MAKEUP TO GO
FROM TIRED TO TERRIFIC**

Feedback

**< BACK TO BRILLIANT INSIGHTS**

You've evolved over the years—and so it makes perfect sense that the products, techniques

▲ EXPAND    IMPORTANT SAFETY INFORMATION    CLOSE X

BOTOX® Cosmetic (onabotulinumtoxinA) Important Information

Approved Uses
BOTOX® Cosmetic is a prescription medicine that is injected into muscles and used to temporarily improve the look of both moderate to severe crow's feet lines and frown lines between the eyebrows in adults.

IMPORTANT SAFETY INFORMATION
BOTOX® Cosmetic may cause serious side effects that can be life threatening. Call your doctor or get medical help right away if you have any of these problems any time (hours to weeks) after injection of

making primer a makeup essential. Primer not only creates a smooth surface that color can adhere to, but also reflects light particles, to instantly wake up a wan complexion.

2. **Brush on foundation**. Piling on a heavy layer of foundation or powder will only make lines and wrinkles stand out more. For a more-natural effect, use a synthetic-bristle brush to concentrate coverage around key areas, such as on your nose, forehead and chin.

3. **Concealer**. Applied from the inner corner to mid-pupil, concealer really brightens up the eye.

**READ OUR TERMS AND CONDITIONS**

## QUESTIONS?

Contact the *Brilliant Distinctions*®
Customer Support Line

## 1.888.324.2745

(9 A.M. - 8 P.M. EST. M-F)

## BOTOX® Cosmetic (onabotulinumtoxinA) Important Information

### Approved Uses

BOTOX® Cosmetic is a prescription medicine that is injected into muscles and used to temporarily improve the look of both moderate to severe crow's feet lines and frown lines between the eyebrows in adults.

### IMPORTANT SAFETY INFORMATION

**BOTOX® Cosmetic may cause serious side effects that can be life threatening. Call your doctor or get medical help right away if you have any of these problems any time (hours to weeks) after injection of BOTOX® Cosmetic:**

- **Problems swallowing, speaking, or breathing**, due to weakening of associated muscles, can be severe and result in loss of life. You are at the highest risk if these problems are pre-existing before injection. Swallowing problems may last for several months
- **Spread of toxin effects.** The effect of botulinum toxin may affect areas away from the injection site and cause serious

symptoms including loss of strength and all-over muscle weakness, double vision, blurred vision and drooping eyelids, hoarseness or change or loss of voice, trouble saying words clearly, loss of bladder control, trouble breathing, trouble swallowing. **If this happens, do not drive a car, operate machinery, or do other dangerous activities**

**The dose of BOTOX® Cosmetic is not the same as, or comparable to, another botulinum toxin product.**

There has not been a confirmed serious case of spread of toxin effect when BOTOX® Cosmetic has been used at the recommended dose to treat frown lines, crow's feet lines or both at the same time.

**Serious and/or immediate allergic reactions have been reported.** They include: itching, rash, red itchy welts, wheezing, asthma symptoms, or dizziness or feeling faint. Tell your doctor or get medical help right away if you are wheezing or have asthma symptoms, or if you become dizzy or faint.

**Do not take BOTOX® Cosmetic if you:** are allergic to any of the ingredients in BOTOX® Cosmetic (see Medication Guide for ingredients); had an allergic reaction to any other botulinum toxin product such as *Myobloc*® (rimabotulinumtoxinB), *Dysport*® (abobotulinumtoxinA), or *Xeomin*® (incobotulinumtoxinA); have a skin infection at the planned injection site.

**Tell your doctor about all your muscle or nerve conditions,** such as amyotrophic lateral sclerosis (ALS or Lou Gehrig's disease), myasthenia gravis, or Lambert-Eaton syndrome, as you may be at increased risk of serious side effects including difficulty swallowing and difficulty breathing from typical doses of BOTOX® Cosmetic.

**Tell your doctor about all your medical conditions, including:** plans to have surgery; had surgery on your face; weakness of forehead muscles, such as trouble raising your eyebrows; drooping eyelids; any other abnormal facial change; are pregnant or plan to become pregnant (it is not known if BOTOX® Cosmetic can harm your unborn baby); are breast-feeding or plan to breast-feed (it is not known if BOTOX® Cosmetic passes into breast milk).

**Tell your doctor about all the medicines you take,** including prescription and nonprescription medicines, vitamins, and herbal products. Using BOTOX® Cosmetic with certain other medicines may cause serious side effects. **Do not start any new medicines until you have told your doctor that you have received BOTOX® Cosmetic in the past.**

Especially tell your doctor if you: have received any other botulinum toxin product in the last 4 months; have received injections of botulinum toxin, such as *Myobloc*®, *Dysport*®, or *Xeomin*® in the past (be sure your doctor knows exactly which product you received); have recently received an antibiotic by injection; take muscle relaxants; take an allergy or cold medicine; take a sleep medicine; take aspirin-like products or blood thinners.

**Other side effects of BOTOX® Cosmetic include:** dry mouth, discomfort or pain at the injection site, tiredness, headache, neck pain, and eye problems: double vision, blurred vision, decreased eyesight, drooping eyelids, swelling of your eyelids, and

dry eyes.

For more information refer to the Medication Guide or talk with your doctor.

To report a side effect, please call Allergan at 1-800-433-8871.

**Please see BOTOX® Cosmetic full Product Information including Boxed Warning and Medication Guide.**

## LATISSE® (bimatoprost ophthalmic solution) 0.03% Important Information

### Approved Use

**LATISSE®** is an FDA-approved treatment to grow eyelashes for people with inadequate or not enough lashes.

### Important Safety Information

If you use/used prescription products for eye pressure problems, use **LATISSE®** under doctor care. May cause brown darkening of the colored part of the eye which is likely permanent. **LATISSE®** may cause eyelid skin darkening which may be reversible. Only apply at base of the upper lashes. DO NOT APPLY to lower lid. Hair may grow outside the treatment area. If you have eye problems/surgery, consult your doctor. Common side effects include itchy and red eyes. If discontinued, lashes will gradually return to previous appearance.

To report a side effect, please call Allergan at 1-800-433-8871.

**Please see LATISSE® full Product Information.**

## JUVÉDERM® XC and JUVÉDERM VOLUMA® XC Important Information

### APPROVED USES

JUVÉDERM® XC injectable gel is injected into areas of facial tissue where moderate to severe facial wrinkles and folds occur to temporarily add volume to skin, especially around the nose and mouth.

JUVÉDERM VOLUMA® XC injectible gel is for deep injection in the cheek area to correct age-related volume loss in adults over the age of 21.

### IMPORTANT SAFETY INFORMATION

**Are there any reasons why I should not receive JUVÉDERM® XC or JUVÉDERM VOLUMA® XC?**

Do not use these products if you have a history of multiple sever allergies or severe allergic reactions (anaphylaxis), or if you

are allergic to the proteins (gram positive bacterial proteins) used to make the hyaluronic acid (HA) in these products. Do not use JUVÉDERM® XC or JUVÉDERM VOLUMA® XC if you are allergic to lidocaine.

**What precautions should my healthcare professional advise me about?**

- The safety of JUVÉDERM® XC and JUVÉDERM VOLUMA® XC injectible gels for use during pregnancy or in women who are breastfeeding has not been studied.
- The safety of JUVÉDERM® XC for use in patients under 18 years and JUVÉDERM VOLUMA® XC for patients under 35 years or over 65 years has not been studied.
- The safety and effectiveness of JUVÉDERM® XC for treatment of areas other than facial wrinkles and folds (such as lips) have not been established in clinical studies.
- The safety and effectiveness of JUVÉDERM VOLUMA® XC for treatment in areas other than the cheek area have not been established in clinical studies.
- The safety of JUVÉDERM® XC and JUVÉDERM VOLUMA® XC in patients with a history of excessive scarring (eg, hypertrophic scarring and keloid formations) and pigmentation disorders has not been studied, and use may result in additional scars or changes in pigmentation.
- The safety of JUVÉDERM VOLUMA® XC in patients with very thin skin in the cheek area and the safety of repeat treatments in patients has not been studied.
- There is a possible risk of inflammation at the treatment site if laser procedures and chemical peeling are performed after treatment.
- Patients who experience skin injury near the site of injection with these products may be at a higher risk for side effects.
- Tell your healthcare professional if you are on therapy used to decrease the body's immune response (immunosuppressive therapy). Use of these products may result in an increased risk of infection.
- Tell your healthcare professional if you are using medications that can prolong bleeding, such as asprin, ibuprofen, or other blood thinners, as this may result in increased bruising or bleeding at the injection site.
- Minimize strenuous exercise and exposure to extensive sun or heat within the first 24 hours following treatment with JUVÉDERM VOLUMA® XC.

## What are possible side effects?

For JUVÉDERM® XC, most side effects are mild or moderate in nature, and last 7 days or less. The most common side effects include temporary injection-site reactions such as: redness, pain/tenderness, firmness, swelling, lumps/bumps, bruising, itching, and discoloration.

For JUVÉDERM VOLUMA® XC, side effects are moderate (uncomfortable), and generally last 2 to 4 weeks. The most common side effects include temporary reactions at the treatment site such as tenderness, swelling, firmness, lumps/bumps, bruising, pain, redness, discoloration, and itching.

As with all skin-injection procedures, there is a risk of infection.

To report a side effect with JUVÉDERM® XC or JUVÉDERM VOLUMA® XC, please call Allergan Product Surveillance at **1-800-624-4261**.

**For more information, please see www.juvederm.com or call the Allergan Medical Information line at 1-800-433-8871.**

JUVÉDERM® XC and JUVÉDERM VOLUMA® XC injectable gels are available by prescription only.

## Natrelle® Breast Implants Important Information

### Who may get breast implants (INDICATIONS)?

Natrelle® Breast Implants are indicated for women for the following :

- **Breast augmentation for women at least 22 years old for silicone-filled implants.**
  **Breast augmentation for women at least 18 years old for saline-filled implants.**
  Breast augmentation includes primary breast augmentation to increase breast size, as well as revision surgery to correct or improve the result of a primary breast augmentation surgery.

**IMPORTANT SAFETY INFORMATION**

**Who should NOT get breast implants (CONTRAINDICATIONS)?**

- Women with active infection anywhere in their body.
- Women with existing cancer or pre-cancer of their breast who have not received adequate treatment for those conditions.
- Women who are currently pregnant or nursing.

**What else should I consider (WARNINGS)?**

- Breast implants are not lifetime devices, and not necessarily a one-time surgery.
- Many of the changes to your breasts following implantation cannot be undone. If you later choose to have your implant(s) removed and not replaced, you may experience unacceptable dimpling, puckering, wrinkling, or other cosmetic changes of the breast, which may be permanent.
- Breast implants may affect your ability to breastfeed, either by reducing or eliminating milk production.
- Rupture of a silicone-filled breast implant is most often silent and may not be detected by you or your doctor. You should have an MRI 3 years after your surgery and then every 2 years after that for as long as you have your breast implants to determine if rupture is present. If implant rupture is noted on an MRI, you should have the implant removed, with or without replacement.
- With breast implants, a routine screening mammography and self-examinations for breast cancer will be more difficult. Ask your doctor to help you distinguish the implant from your breast tissue. Symptoms of a ruptured implant may be hard knots or lumps surrounding the implant or in the armpit, change or loss of size or shape of the breast or implant, pain tingling,

swelling, numbness, burning or hardening. Tell your doctor of these symptoms and remove ruptured implants.
- Inform any other doctor who treats you of the presence of your implants to minimize the risk of damage to the implants.

**What types of conditions require more study (PRECAUTIONS)?**

Caution: Notify your doctor if you have any of the following conditions, as the risks of breast implant surgery may be higher:

- Autoimmune diseases (for example, lupus and scleroderma).
- A weakened immune system (for example, currently taking drugs that weaken the body's natural resistance to disease).
- Planned chemotherapy following breast implant placement.
- Planned radiation therapy to the breast following breast implant placement.
- Conditions that interfere with wound healing and blood clotting.
- Reduced blood supply to breast tissue.
- Clinical diagnosis of depression or other mental health disorders, including body dysmorphic disorder and eating disorders. Please discuss any history of mental health disorders with your surgeon prior to surgery. Patients with a diagnosis of depression or other mental health disorders should wait for resolution or stabilization of these conditions prior to undergoing breast implantation surgery.

**What are some complications with breast implants (COMPLICATIONS)?**

Key complications are reoperation, implant removal with or without replacement, implant rupture with silicone-filled implants, implant deflation with saline-filled implants, and severe capsular contracture (severe scar tissue around the implant). Other complications include asymmetry, nipple/breast/skin sensation changes, scarring or wrinkling/rippling. Talk to your doctor about other complications.

**Talk to your doctor. For more information see the Patient Brochures at www.allergan.com/labeling/usa.htm or call the Allergan Product**
**Support line at 1-800-433-8871.**

To report a problem with Natrelle®, please call Allergan Product Surveillance at 1-800-624-4261.

Natrelle® Breast Implants are available by prescription only.

**BOTOXCOSMETIC.COM** | **JUVEDERM.COM** | **PRIVACY STATEMENT** | **TERMS OF USE** | **CONTACT BRILLIANT DISTINCTIONS®**



©2015 Allergan, Inc. ® and ™ marks owned by Allergan, Inc. **JUVÉDERM®** mark owned by Allergan Industrie SAS.

*SkinMedica®* registered trademarks are owned by SkinMedica, Inc.

*Royalton®* registered trademarks are owned by Morgans Group, LLC.

*Tourneau®* registered trademarks are owned by Tourneau, LLC.

*Canyon Ranch®* registered trademarks are owned by CR License LLC, an AZ. LLC.

*Dysport®* is a registered trademark of Ipsen Biopharm Limited

*Myobloc®* is a registered trademark of Solstice Neurosciences, Inc.

*Xeomin®* is a registered trademark of Merz Pharma GmbH & Co. KGaA

iPad® is a registered trademark of Apple, Inc.

**Allergan reserves the right to alter or cancel the program with no advance notice or obligation.**

**APC56QD15**

# Exhibit 2

[ATTACH A COPY OF A PHOTOGRAPH/REPRODUCTION REFERENCE HERE]

# MODEL RELEASE



For good and valuable consideration that I acknowledge as received, and with the intent to be legally bound, by signing this release I hereby irrevocably grant to _____ ("Photographer"), his/her affiliates, licensees, agents and assigns (and their employees, while acting within the scope of their employment) the absolute and irrevocable right and unrestricted permission in respect to the photographs that he/she has taken of me or in which I may be included, to copyright the same, in his/her own name or otherwise; to use, re-use, publish, and re-publish the same in whole or in part, individually or in conjunction with other photographs, in any medium and for any purpose whatsoever, including (but not by way of limitation) illustration, promotion, art, editorial, advertising, and trade, and to use my name in connection therewith if he/she so chooses; and I hereby release and discharge Photographer from any and all claims and demands arising out of or in connection with the use of the photographs, including without limitation any and all claims for libel or invasion of privacy.

This authorization and release shall also inure to the benefit of the heirs, legal representatives, licensees, and assigns of Photographer, as well as the person(s) for whom he/she took the photographs.

I am of full age and have the right to contract in my own name. I have read the foregoing and fully understand the contents thereof. This release shall be binding upon me and my heirs, legal representatives and assigns.

Signature: _____

Printed Name: _____

Date: _____

# Exhibit 3

**MODEL RELEASE**

[ATTACH A COPY OF A PHOTO ID OR VISUAL REFERENCE HERE]




For good and valuable consideration that I acknowledge as _____ and with _____ intend to be legally bound, by signing this release _____.

_____ his/her affiliates, licensees, agents and assigns (and their respective licensees and assigns) ("Assigns"), the unrestricted right to use my appearance, form, likeness and voice, or that of the minor named below (if applicable), contained in the photographs, film, or recording of me (or the named minor, if applicable) by Photographer as part of a shoot described below ("Images"), and to distribute such Images for editorial, trade, advertising, packaging or other purposes in any manner or medium (including without limitation broadcast, online and print), whether now or hereafter devised, throughout the world, in perpetuity. I understand Photographer may contract with a stock agency and that the Images may be included in stock files. I further understand and agree that the Images may be modified, altered, cropped and combined with other content such as images, video, audio, text and graphics.

I waive any right to the Images, including the right to inspect or approve any use of the Images and any additional money or consideration for any use of the Images. I acknowledge and agree that this release is binding on my heirs and assigns, and that the personal information provided by me to Photographer as part of this release may be used and disclosed by the Photographer and his/her Assigns for the purposes of selling, licensing and distributing my likeness for commercial purposes and confirming my consent. I expressly release Photographer and his/her Assigns from and against any and all actions, liabilities, losses, demands or claims that I have or may in the future have for rights of publicity, invasion of privacy, defamation, libel or slander and/or any other tort or cause of action arising out of any use of the Images, even if such use is unflattering, embarrassing or objectionable to me. In any event, I agree that my monetary damages awarded against Photographer or his/her Assigns if any, shall not under any circumstances exceed $US 500.00.

Please check one of the following boxes (as applicable):

☒  I represent and warrant that I am at least eighteen years of age, am competent and have authority to execute this release.

☐  If parent or guardian is executing on behalf of a minor appearing in image:  I represent and warrant that I am at least eighteen years of age and have full legal capacity to execute this release of rights in the Images for the following minor:   Full name of minor: _____

Description of Shoot:    CLINIQUE  UNDER WATER SHOT  'SPIEGEL BEAUTY'

For Photographer Only:                                    For Model Only (Required):

_____                          _____
Photographer's Signature                              Model's Signature (or Parent/Guardian of Minor)

BILL  DIDDITO                                         Elodie  PASTOR-NICOLE
Printed Name                                          Printed Name

                                                     Oct-11-09
                                                     Date

                                                     235  Southend  ave  #14G
                                                     Model's Address
                                                     NY - NY - 10630. USA
                                                     917  994  6341
                                                     Model's Phone No.

_____                          elodiepn06@hotmail.com
witness                                               Model's Email

                                                     Oct. 11 July  1980
Lauren  Bonward-Whitee                                Model's Date of Birth
6/14/07

Rev'd 6-18-07